Reynolds, Stanchfield & Collin, for appellant.
O. P. Hurd, C. M. Woodward, and Owen Cassidy, for appellees.

PER CURIAM. Judgment unanimously affirmed, with costs, on the opinion of LYON, J., at Special Term.

---

### In re BURBANK.

#### (Supreme Court, Appellate Division, First Department. May 12, 1905.)

**1. WILLS—WITNESSES—SIGNATURE OF WITNESS.**

On an issue as to the execution of an alleged lost will, the fact that a witness thereto, whose signature was proved, signed after the name of the other witness, did not prove the signature of the other.

**2. SAME—PROVING SIGNATURE—COMPARISON OF WRITING.**

On an issue as to the execution of an alleged lost will, a witness testified that she saw the will about 14 years before, and that a certain name appeared on it as that of a witness, and testified that it was the signature of such witness, in her opinion, which was based on the fact that after the commencement of the litigation she had examined certain signatures of such witness. *Held*, that the evidence was incompetent.

**3. WILLS—REVOCATION—EVIDENCE—SUBSEQUENT DECLARATIONS OF TESTATOR.**

2 Rev. St. 1829, p. 64, c. 6, tit. 1, art. 3, § 42, declares that no will shall be revoked, except by a writing by testator executed with the same formalities with which a will itself was required to be executed, or unless the will be burnt, etc. *Held* that, on an issue as to whether a will had been revoked by a subsequent lost or destroyed will, declarations of testator subsequent to the making of the wills were inadmissible.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 690–696.]

**4. WILLS—CONTEST—WITNESSES—INCAPACITY OF WITNESS—ADJOURNMENT.**

Where, on a will contest, the trial had commenced, it was not error for the surrogate to refuse to postpone the closing of the trial until a person who was then insane could recover sufficiently to be a witness; it appearing that it would certainly be months before such person would be in a condition to testify, and that he might never be in such condition.

Hatch, J., dissenting.

Appeal from Surrogate's Court, New York County.

Judicial proceedings on the probate of the will of Ambrose B. Burbank, deceased. From a judgment admitting a paper purporting to be the will of deceased to probate, the contestants appeal. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

James W. Osborne, for appellants Duvernois and others.

Hampton D. Ewing, special guardian for Alberta Ellis and others.

Lewis L. Delafield, for respondents.

VAN BRUNT, P. J. There is no claim made upon this appeal but that the will which was admitted to probate was duly executed, so as to entitle it to probate, and that the testator at the time of its execution was of sound mind, and that there was no evidence of undue influence. It is urged, however, that there was competent

evidence offered tending to show that the testator had made two later wills, thereby revoking the will admitted to probate, which, however, had been lost or destroyed, and consequently could not be produced.

The questions presented upon this appeal are whether there was evidence presented which established the execution of either of these wills, and, if there was not, whether the learned surrogate erred in his rulings excluding evidence which the contestants claim was competent as tending to show the due execution of these instruments, or one of them. There is also another point raised, because of the refusal of the surrogate to postpone the conclusion of the hearing upon the application to probate the will in question until a nephew who had attempted to commit suicide, and was then insane, could recover sufficiently to be a witness.

The evidence adduced upon the trial, so far as relates to the execution of the wills in question, seems to be as follows: Ambrose B. Burbank died in this county on the 17th day of January, 1904, aged 93 years. It appeared that he left a will, which he had duly executed on the 29th of March, 1889, which is the instrument admitted to probate. The contestants then offered evidence which they claimed tended to show that on the 27th day of December, 1889, the same year that he had made the probated will, the testator had made another will, by which he revoked the will which was admitted to probate. The evidence of Mrs. Newcomb, the widow of a deceased nephew of the testator, was to the effect that on the 28th of March, 1890, the testator called at the Hoffman House, where the witness was staying with her husband and her daughter, and that an interview took place at which the testator, her husband, since deceased, her daughter, and herself were present, and that the testator took from his overcoat pocket two papers, and said, "Newcomb, here is my will." Mrs. Newcomb further stated that she knew her uncle Ambrose's handwriting; that the paper (referring to paper dated December 27, 1889, and called "Will No. 2") was, from the beginning to the end, in the handwriting of her uncle Ambrose; that it was signed by him; that she had ample time to examine the paper; that she had it in her hands three times that day; and that the first thing on the outside was, "Last Will and Testament of Ambrose B. Burbank, December 27th, 1889," and then on the inside it was altogether in his handwriting. The witness further testified that she saw some writing under the signature of the testator that went across the page, and that she saw two names below that, in two handwritings. The names were Alex. T. Groser and Alpheus D. Du Bois. The witness further stated that she knew the handwriting of Mr. Groser, having seen him write, and that the name "Alex. T. Groser," at the bottom, was in Mr. Groser's handwriting. Du Bois and Groser both died before the testator. Groser's name was below that of Du Bois. The witness further testified that the name of Du Bois was not in the handwriting of Groser or the testator. The witness at this time did not know the handwriting of Mr. Du Bois, and she never saw him while living, and never, so far as appears, had any communication

with him or saw any communication from him. · Mr. Du Bois died on December 13, 1903, and the only way which the witness had acquired any knowledge of Mr. Du Bois' handwriting was that pending the proceedings for the probate of the first will herein, as appears by the evidence of her daughter, who was subsequently examined as a witness, she examined what purported to be the will of Du Bois on file in the surrogate's office of New York county, and some pay rolls in the comptroller's office, upon which Mr. Du Bois' signature appeared; he having been employed in the educational department of the city in his lifetime. The witness herself stated that she examined the pay rolls after she had seen Mr. Du Bois' signature on his will in the surrogate's office. The witness was then asked if she then (that is, at the time of testifying) knew the signature of Du Bois, and this was excluded. All evidence as to the contents of the December will was excluded upon the ground that the factum was not proven. A daughter of Mrs. Newcomb was called, and testified to the same effect as her mother. Mrs. Newcomb also testified to having seen a still later will, dated June, 1897. One of the witnesses to this third will was Mr. Groser, but she stated that she was unable to distinguish the name of the other witness because it was written illegibly. Letters of the testator containing declarations as to a will subsequent to that probated were offered in evidence, but they were excluded. The exceptions to these various rulings raise the principal questions which are presented upon this appeal.

It is claimed by the contestants that the evidence of Mrs. Newcomb and her daughter as to the handwriting of Du Bois as a witness to the second will should have been received, and that it was error to exclude the same; that the letters of the testator containing declarations as to his wills were competent evidence, and that it was error to reject the same, and that, even if these rulings were correct, there was sufficient evidence to show the due execution of a will later than that probated; and that they should have been allowed to prove its contents, its loss being established. It is urged in support of the latter proposition that they have proved the existence of a will in the handwriting of the testator, duly signed by him, and also signed by two witnesses at the end of an attestation clause; that they have proved that both of the witnesses are dead, and the signature of one of them, who was the last to sign; and that they have also proved that it was the intention of the testator to revoke the will probated by the lost will, No. 2.

Under this state of proof, it is claimed by the contestants that the court should have drawn the presumption that will No. 2 was duly executed. Some English cases are cited which seem to uphold this view; but our attention has not been called to any case in this state where the evidence of a desire of a testator not to die intestate, or not to die testate as to a particular will, coupled with incompetent evidence of an effort to effectuate this purpose, has ever been held to supply the want of complete proof of the due execution of an instrument carrying out this purpose. It is to be

observed that the English statute in reference to the execution of wills is very different from ours. Ceremonies attending the due execution of a will under our laws are not at all provided for by the English statute. The English statute requires, for the due execution of a will, that it shall be in writing; that it shall be signed by the testator at the end thereof, and his signature shall be made or acknowledged by the testator in the presence of two or more witnesses present at the same time, and such witnesses shall attest and shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary. In addition to those requirements, our statute provides that at the time of signing the will or making such acknowledgment the testator shall declare the instrument so subscribed to be his last will and testament, and that the witnesses shall sign at his request; these latter formalities being absolutely essential to the validity of the execution of the will. Our statute further provides that, where the subscribing witnesses to a will are dead, such proof shall be taken of the handwriting of the testator and of the witnesses so dead and of such other circumstances as would be sufficient to prove such will on a trial at law; that is, you must prove the signatures of the testator and of at least two witnesses by legal evidence, where the witnesses are dead, and also such other circumstances as show that the formalities of the statute have been complied with. Presumptions have been indulged in in our courts to supply the direct proof of the circumstances required by the statute to accompany the due execution of a will, as that the subscribing witnesses, when dead, are said to speak through the attestation clause of the will; but the proof of the signatures has never been dispensed with, and presumption allowed to supply its place.

The claim that, because Groser signed his name under that of Du Bois, it proved Du Bois' signature, hardly seems tenable, as, under such circumstances, the signature of a dead man would be of greater potency than that of a living witness. Besides, there is no evidence whatever that Groser knew Du Bois or his signature. Under our law, witnesses are not required to sign the will in the presence of each other, as is required by the English statute.

This brings us to the consideration of the question as to whether errors were committed in the exclusion of proposed evidence.

The first error claimed is the exclusion of the evidence of Mrs. Newcomb and her daughter of their opinion as to the genuineness of the signature "Alpheus D. Du Bois" at the end of the will. It is urged that, although these witnesses had never seen or known Mr. Du Bois, had never seen him write, nor had ever seen any writing made by him, nor had seen any signature purporting to be his, except that alleged to have been signed to will No. 2 some 14 years ago, before the commencement of these proceedings, they became competent witnesses upon the subject of the signature of Mr. Du Bois, because during the progress of these proceedings they had seen a signature to a will which purported to be the will of Mr. Du Bois,

and some signatures to pay rolls which were proved to have been those of Mr. Du Bois. In other words, it is claimed that these witnesses, having compared the recollection of the signature that they had seen 14 years ago at the end of the will of December, 1889, purporting to be the signature of Mr. Du Bois, with some signatures proved to be his, are competent to testify from this comparison of handwritings as to the verity of the signature at the end of the destroyed will. I have been unable to find any rule of evidence which permits such a one-sided qualification of a witness to testify upon a particular trial. I say "one-sided qualification," because there is no possibility of any one else preparing himself in the same way, as he has not and cannot have the "to be proved signature" for his examination, it having been destroyed. In all cases where evidence has been allowed because of qualification by comparison of handwritings, all the writings must be before the court, so that the opposite party may have an equal opportunity for comparison.

It is undoubtedly true that opinions as to handwriting are always the result of comparison of handwriting, the witness comparing the "to be proved signature" in his mind with signatures that he has seen written, or with signatures to letters or other documents which the witness has seen, purporting to be in the handwriting of the party whose signature is to be proved, and which letters and documents are surrounded by such circumstances as induce a reasonable presumption of their being his own handwriting. But in these cases of comparison the opposing party may resort to the same kind of evidence, producing witnesses who have also seen the party write, or have seen writings of his. "In these cases the witness acquires his knowledge by his own observation of facts occurring under his own eye, and, which is especially to be remarked, without having regard to any particular person, case, or document." Greenleaf on Evidence, § 577. Where, however, the writings are compared with a "to be proved signature" which exists only in the mind of the witness, no opportunity is offered to meet such evidence. The rule seems to be universal that it is only an "expert" that can qualify himself to give evidence in a particular case, and an expert as to handwriting is defined to be "any person who has had such experience in the examination of handwriting as to enable him to note and distinguish the characteristics of handwriting." Recognizing the rule that experts only can qualify themselves to testify in a particular case, there seems to have been an attempt upon the part of the contestants here to show that Mrs. Newcomb had had such experience of handwriting as would qualify her to testify as an expert, but the evidence fell far short of showing such qualification, and the claim that she was an expert does not seem to be now insisted upon.

In the case of Miles v. Loomis, 75 N. Y. 288–298, 31 Am. Rep. 470, the opinion of the court expressly recognizes the rule that it is only an expert that can especially qualify himself to testify in a particular case. The court calls attention to the case of Doe v. Suckermore, 5 A. & E. 703, decided in 1836, in which case it states:

"The whole subject received very great consideration. * * * The rule seemed to be conceded in that case by all the judges that, as to any but ancient writings, an opinion formed upon a mere comparison of hands at the trial, eo instanti, was not admissible, but they were equally divided upon the question whether a knowledge of the handwriting might be obtained by a skilled person, sufficient to render him a witness competent to speak as to the genuineness of the signature, merely by a previous examination of other signatures proved to be genuine."

I have been unable to find any case which in the slightest degree recognizes the admissibility of the evidence of any person who had qualified himself to testify in the particular case, unless all the writings compared are produced.

It appears that there are three methods by which a witness may be qualified to speak as to handwriting to be proved: First, by having seen the party write. Second, by having seen letters or documents in the handwriting of the party whose signature is sought to be proved, having personally communicated with him respecting them, or acted upon them as his, the party having known and acquiesced in such act, or by such adoption of them as induces a reasonable presumption of their being his own writing; third, by comparison of handwritings by an expert. The counsel for contestants contend that the second mode is that involved in this proceeding. But there is one essential element in the second method conspicuously absent in this case. Whatever knowledge the witness has who seeks to bring himself under the rule of the first two cases must be acquired by his own observation of facts occurring under his own eye, and which is especially to be remarked, without having regard to any particular person, case, or document. Greenleaf on Evidence, § 577. In the case at bar the knowledge as to the handwriting, whatever it was, was especially acquired, having regard to a particular person, case, and document, directly in contravention of the rule which governs this class of evidence. In no view of the evidence, therefore, were these witnesses qualified to give their opinion as to the signature "Du Bois" at the end of the will.

The next class which it is claimed was erroneously excluded was that consisting of declarations of the testator relating to his wills. It may be well to call attention at this point to the statute which declares the methods by which a will may be revoked. 2 Rev. St. 1829, p. 64, c. 6, tit. 1, art. 3, § 42, provides, amongst other things, that:

"No will in writing * * * nor any part thereof shall be revoked or altered, otherwise than by some other will in writing, or some other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed, or unless such will be burnt, torn, cancelled, obliterated, or destroyed, with the intent and for the purpose of revoking the same, by the testator himself," etc.

In view of the statute regulating the execution of wills, and this statute governing the method of revocation, the courts have held that declarations of a testator made subsequent to the event are inadmissible upon the issue of the making or revocation of a

will; it being held that the consideration of such evidence would
be, in effect, a repeal of the requirements of the statute. It is
true that cases may be cited where such evidence has been ad-
mitted without objection, and the courts have commented upon it
and seem to have given it considerable weight; but no case has
been called to our attention which has held that, where such evi-
dence has been objected to, it was error to exclude it. As a
matter of principle, it would seem that such evidence must be in-
competent. If it is admissible, a will could be established or re-
voked without proof that the formalities which the law has hedged
around testamentary papers had in any respect been complied with.
The only declarations of a testator in respect to such papers which
are competent are those that he makes at the time of execution,
they being then part of the res gestæ. The requirement of the
statute that the signatures to wills of such witnesses as may be dead
shall be proved shows that nothing short of common-law proof of
the facts required by the statute to attend the execution of testa-
mentary papers will suffice. The intention of a testator may be
a guide in the construction of a will, but it will not supply, no mat-
ter how proven, proof of compliance with the requirements of the
law.

In the case of Atkinson v. Morris, in the Court of Appeal, Pro-
bate Division, 1897, the rule is laid down (concurred in by all the
judges) that declarations made by a testator after the date of an
alleged will are not admissible to prove the execution of a will, and
they are equally inadmissible to prove its revocation. Lord Rus-
sell, of Killowen, C. J., says upon this point:

"No one can doubt that the lady intended to revoke her will, and that the
court ought to be astute to give effect to that intention, if it can do so con-
sistently with the established and settled principles of law. The wills act
has laid down the formalities which are to be observed in order to make an
effective and operative will, and, if those formalities are not complied with,
the law steps in, and, however clear the intentions of the testator may have
been, unless they are expressed conformably to the requirements of the stat-
ute, they are disregarded, and his estate is distributed as upon an intestacy.
The statute also prescribes similar formalities in the case of the revocation
of a will. When it is to be revoked by writing, the writing must be attested
by the same formalities as are required in the case of a testamentary dis-
position. It is clear, therefore, in the present case, that although the inten-
tion of the testatrix to revoke her will was clearly expressed, and expressed
in writing, it is not expressed conformably to the statute, and the writing,
which would have been perfectly good if it had been duly attested, cannot be
relied upon as evidence of revocation."

Lindley, L. J., concurred in the above, and at the end of his opin-
ion sums up the whole matter; saying that there was no revoca-
tion, because "she has not done that which the law requires to
effectuate her intention." A. L. Smith, L. J., says:

"I own that I have struggled during the argument of this case to escape
having to hold that this will of August 8, 1878, as it now stands, expressed
the intention of the testatrix at the time of her death. I have not the slight-
est doubt that it did not then express her intention, and I have looked care-
fully to see whether we could not get out of the difficulty in which we are
placed in holding that this was her last will and testament at her death,
when I know it was not her intention that it should be."

He then, in speaking of the rejection of the evidence of declarations of the testatrix, says:

"The objection taken is that this evidence is not admissible, for this reason: You cannot prove the factum of the execution of a will, according to the wills act, by hearsay evidence—by a statement of the testatrix herself that she had executed the will. I am clearly of the opinion that this objection is well founded."

He then refers to the fact that there is a long series of authorities showing that declarations as to execution of wills are inadmissible, and proceeds:

"How is it possible, in the face of these authorities, * * * now to say that the factum of the execution of a will can be proved by hearsay evidence? In my judgment, the proposed evidence was inadmissible, and it was rightly rejected by the learned judge."

I have cited thus at length from the opinions of the learned judges who wrote in the case cited to show how rigid the rule is, as, notwithstanding all the sympathies of the judges were the other way, it was felt that the statute must control. The same rule obtains in this state. In the matter of Kennedy's Will, 167 N. Y. 163, 60 N. E. 442, Judge O'Brien, in expressing the views of the court, says:

"The great weight of authority in this state is to the effect that the declarations of a deceased person are not competent evidence either to prove that he has made a will, or to prove the continued existence of a written will, unless made in connection with some act under such circumstances as to become a part of the res gestæ; and declarations of the deceased tending to show that a written will has been revoked are open to the same objection, unless they accompany some act which the statute prescribes as a requisite of revocation, and then they are received, as in other cases, as part of the res gestæ."

In the case of Throckmorton v. Holt, 180 U. S. 552, 21 Sup. Ct. 474, 45 L. Ed. 663, the rule is distinctly laid down that the declarations of the deceased, when not a part of the res gestæ, are not admissible to prove the execution of a will, or its revocation.

It seems to be clear, therefore, that declarations of the testator, made after the factum of the execution of the wills, were incompetent to prove the execution of will No. 2 or the revocation of will No. 1, and were properly excluded.

The only other question which remains to be considered is whether it can be said that the learned surrogate abused his discretion in refusing to postpone the closing of the trial until Samuel M. Burbank could be produced as a witness. We do not think that he did. The trial had been commenced, and it would be a very unusual thing to suspend a trial to await the production of a witness. It is true that the surrogate made an order for the examination of Samuel M. Burbank. But that was done when it was thought that he could be produced. When, however, the true condition was shown to the surrogate, and that it would certainly be months before he could possibly be in a condition to testify, and might never be in such a condition, there does not seem to have been any abuse of discretion in not waiting upon this uncertainty.

The decree should be affirmed, with costs to the respondent against the contestants.

PATTERSON, O'BRIEN, and INGRAHAM, JJ., concur.

HATCH, J. I am unable to concur in the prevailing opinion in this case. It is conceded that the rule in England, under its statute of wills, within the evidence herein, would be sufficient to establish the factum of will No. 2, which, it is claimed, revoked will No. 1, had it been propounded for probate. This seems to be established under authoritative decisions by the English courts in two recent cases, one decided in 1900 (Matter of Peverett, L. R. P. D. 205), and the other decided in 1902 (Harris v. Knight, L. R. 15 Pro. Div. 170). As is pointed out, however, in the prevailing opinion, the publication of the instrument as a will is not required by the English statute, but is required under our statute of wills; and the authorities are to the effect that subscription and acknowledgment and publication are two distinct acts, and that the first cannot stand for the latter.

Aside from this question, however, I am of opinion that the proof offered and received in the case, and the proof offered which has been rejected, had it been received, was sufficient, in its probative force, to establish the factum of will No. 2, had such will itself been propounded for probate. Evidence was given tending to show that will No. 2 and will No. 3 (the latter bearing date in 1897) were in a trunk in the testator's possession; that immediately upon the testator's death the papers came into the hands of Caleb and Samuel Burbank, and were never seen thereafter. Under the evidence in the case, the surrogate would have been authorized to find that these two wills were fraudulently disposed of after the testator's death. There is no evidence that he destroyed them, and the circumstances proved were sufficient to overcome any presumption that they were destroyed during his lifetime. Under such circumstances, the court is justified in giving force and effect to any competent evidence, however slight, which, if applied, would establish the factum of the will. It is evident, however, that the appellants were not required to assume this burden in order to justify evidence which would authorize the court to find that will No. 1, propounded for probate, had been revoked by either one or the other of the subsequent wills. Section 2620 of the Code of Civil Procedure provides that when "all the subscribing witnesses to a written will are dead * * * the will may nevertheless be established, upon proof of the handwriting of the testator, and of the subscribing witnesses, and also of such other circumstances, as would be sufficient to prove the will upon the trial of an action." Section 1865 of the Code provides for proof of a lost will in certain cases, and this section is made applicable by the provisions of section 2621 of the Code to the probate of a will in a surrogate's court. It is asserted that, before an instrument revoking a former will can be received in evidence, there must be the same degree of proof as to the execution of the instrument as is applied to the will itself;

that, if the revoking clause be contained in a subsequent will, the factum of such will must be established in like manner and strength as would entitle it to be probated, had it been presented to the court for such purpose. The authorities do not seem to support this contention. In Harris v. Harris, 26 N. Y. 453, it was held, under the provision of the Revised Statutes which required two witnesses to establish a will, that such provision related only to the special proceeding to probate the same; that the statute, in its effect, did not abolish the common-law rule of evidence which permitted proof of a lost instrument by a single credible witness in the same manner as a deed. This case was commented upon by the General Term of this court in Upton v. Bernstein, 76 Hun, 516, 27 N. Y. Supp. 1078. Therein a majority of the court held that there was a distinction between proving the factum of a will and its contents. It is not now essential that we agree or disagree with this distinction. It seems to be an authority that, as to a lost will, the contents of it may be proved by a single witness, and force be given to a devise of real estate thereunder; and, if so, it is difficult to see why the contents of a will may not be proved under the like proof of its execution by a single witness in order to establish that a will sought to be probated had been revoked. Mr. Justice Follett, who sat in that case, did not draw such distinction, but held that the will was entitled to be admitted in evidence in order to establish title to realty, and that the provisions of sections 1865 and 2621 of the Code of Civil Procedure had not changed that rule. The distinction which this case makes between proving the contents of the will and the factum, so far as to permit evidence of its contents in resistance of the probate of another will, does not seem to have been adopted, if, indeed, it may be said that the decision so holds. In Colligan v. McKernan, 2 Dem. Sur. 432, a distinguished surrogate, after citing and commenting upon Harris v. Harris, supra, and citing many other authorities, said:

"Upon the authority of these decisions, I hold that parol evidence was properly admitted by the surrogate, not only to show that a will was executed by the decedent after the execution of the one propounded, but to show, also, that such will contains a clause of revocation. And in spite of sections 1865 and 2621, I hold that the existence of such a revoking clause may be lawfully proved by the testimony of a single witness."

The precise point involved in this appeal was involved in the case last cited, as the purpose of the proof was to defeat a will propounded for probate by proof of a subsequent will containing a clause of revocation. This construction of the case of Harris v. Harris, supra, was adopted by the Supreme Court in the Fourth Department, and applied to an issue involving the establishment of a lost will. And the same rule, in substance, is announced in Matter of Barnes' Will, 70 App. Div. 523, 75 N. Y. Supp. 373, by the same court. A similar rule was also recognized in Wallis v. Wallis, 114 Mass. 510. In the present case it appears that both of the subscribing witnesses to will No. 2 are dead. Under such circumstances, resort may be had to proof of the handwriting of the subscribing witnesses, and also couple therewith such other circumstances as would be suf-

ficient to prove the will upon the trial of an action pursuant to the provisions of sections 1865, 2620, and 2621 of the Code of Civil Procedure, above referred to. In the present case it satisfactorily appeared that Mrs. Newcomb was familiar with the handwriting of Mr. Groser, the last subscribing witness to this will. She testified that the signature appended to the paper produced by the testator was his genuine signature, and that the name of the subscribing witness was in the handwriting of Groser. Within the authority of the cases we have cited upon these facts appearing, the appellants became entitled to give proof of any other facts and circumstances tending to establish that the will was executed, and that it contained a revocation of the prior will. Among the circumstances which may be thus proved is the attestation clause. In Nelson v. Mc-Giffert, 3 Barb. Ch. 158, 49 Am. Dec. 170, it was said by the chancellor:

"The attestation clause stated that the will was signed, sealed, and published by the testator as his last will and testament, in the presence of the attesting witnesses, who, at his request and in his presence, subscribed their names thereto. This, after a considerable lapse of time, and when it may reasonably be supposed that the particular circumstances attending the execution of the will have escaped the recollection of the attesting witnesses, is a circumstance from which the court or a jury may infer that these requisites of the statute were complied with."

And the court further said in that case:

"There is no doubt as to the jurisdiction and power of the surrogate to receive proof that the will of 1832 was revoked by a subsequent will of the testator, and that such subsequent will had been fraudulently destroyed, or that it was destroyed by the testator when his mind had become so impaired that he was incompetent to perform a testamentary act. The chancellor alone had the power to take proof of such a will for the purpose of establishing it as a testamentary disposition of the property of the decedent. But in resisting the probate of the instrument propounded by McGiffert as the last will and testament of the decedent, the heirs and next of kin had the right to introduce any testimony which would be sufficient to satisfy the surrogate that the instrument propounded was not in force as a valid will at the death of the testator named therein."

The same doctrine is announced in Matter of Nelson's Will, 141 N. Y. 152, 36 N. E. 3, and in Matter of Cottrell, 95 N. Y. 329.

Independent, therefore, of any question with respect to the competency of Mrs. Newcomb to speak upon the subject of the handwriting of the other subscribing witness to the will, it having appeared that the subscription was made in the genuine handwriting of one of the subscribing witnesses, who was dead, and that the testator had subscribed his name thereto, the attestation clause was entitled to be received in evidence in connection with such proof. In re Bernsee's Will, 141 N. Y. 389, 36 N. E. 314. Upon all of the proof which appeared, the contestants would have been entitled to have the will received in evidence, had it been present; and, as the proof tended to show that it had either been lost or destroyed after the death of the testator, proof of the contents thereof was entitled to be received, not for the purpose of establishing it as a lost or destroyed instrument, but for the purpose of showing that the will propounded for probate had been revoked and was no longer of force. The learned surrogate, in

ruling upon this subject, held that the attestation clause was not admissible in evidence, under the circumstances, for any purpose that the contents of such will could not be given, and all testimony relating thereto was rejected. This ruling, within the authorities we have cited, would seem to constitute error. The declarations of the testator in connection with will No. 2, made in March, 1889, when it was the subject of discussion between the testator and Mr. and Mrs. Newcomb, were also competent, within well-settled authority. Evidence which may be admissible as constituting a part of the res gestæ is not necessarily confined to what occurred at the immediate time of the execution of the will, for the purpose of admitting the same to probate. Thus will No. 2 having been produced at the time of the interview between the testator and Mr. and Mrs. Newcomb, and declared by the testator to be his last will, and the subject of conversation being with respect to its contents and who were the executors of it, and the interview being for the express purpose of discussing such question with one of the executors therein named, constituted all of the declarations made by the testator in that connection competent evidence as bearing upon the execution of the will. Such evidence may be resorted to for the purpose of establishing the facts essential to show the execution of the instrument, so far at least as to make it operative in revocation of a prior will. Indeed, this court has gone so far as to hold that such evidence is competent for the purpose of proving the due execution of a will (Matter of Briggs' Will, 47 App. Div. 47, 62 N. Y. Supp. 294), and is in harmony with the language used by Judge O'Brien in Matter of Kennedy's Will, 167 N. Y. 163, 60 N. E. 442. Therein the learned judge, in discussing the question of the general incompetency of declarations of a testator to prove the revocation of a will, states the exception:

"To become a part of the res gestæ; and declarations of the deceased tending to show that a written will has been revoked are open to the same objection, unless they accompany some act which the statute prescribes as a requisite of revocation, and then they are received, as in other cases, as a part of the res gestæ."

The objection which was interposed to this testimony, and which resulted in its exclusion, was in these words:

"This conversation was many months after the date of the will offered for probate, and therefore it cannot be claimed that it was part of the res gestæ. It is hearsay and incompetent. Objection sustained. (Exception.)"

It will be noticed that this objection was quite wide of the issue involved in the ruling made by the learned surrogate, and to which the proposed testimony related. The res gestæ of the subject was not the will offered for probate, but will No. 2, which was then the subject of the declaration. The issue was, had the testator revoked the will then being propounded for probate? The appellants sought to show that he had, by showing that he produced a will entirely in his own handwriting, subscribed by himself, apparently executed by two subscribing witnesses, with what it is reasonable to infer was an attestation clause, subscribed by two witnesses, and with

respect to that will the testator made declarations. Those dec-
larations certainly were a part of the res gestæ connected with
that will, and, as such, within the authorities which we have
cited, evidence relating thereto was admissible. It seems to be
conceded by the objection that, had the testator produced the
will propounded for probate under similar circumstances, and
made similar declarations concerning it, they would have been
competent in establishment of it; and, if so, then they must have
been competent in establishment of the execution of a will revoking
the will propounded for probate. Such declarations would have no
force, and were entirely immaterial, as bearing upon the validity
of the will propounded for probate. It was not pretended that the
testator spoke concerning it, or that the declarations had relation
thereto. But as to will No. 2 they were directly applicable, and
the testimony was competent and should have been received.

I also think it was error to exclude the testimony of Mrs. New-
comb with respect to the signature of the subscribing witness Du
Bois. It is said that Mrs. Newcomb was not competent to testify
concerning this question, for the reason that she was not an expert
witness, and, further, if she qualified as such, the circumstances
did not bring her testimony within any rule allowing expert testi-
mony to prove handwriting, as applied to these circumstances. It
appeared from the evidence that Mrs. Newcomb had been a busi-
ness woman for over 30 years; that she was engaged in connection
with her husband's tobacco business, and kept his private ledger
for 25 years; that she studied the signatures of his foreign cor-
respondence, went over his checks, and examined the indorsements
thereon; that she made a study of handwriting in connection with
some raised checks which had been manipulated by the manager of
her husband's business; that in this connection she studied the hand-
writing of over 100 checks, in order to determine who raised the
amounts thereon; that an anonymous letter came to the house, and
that she made a study of a great number of handwritings in order
to determine by comparison who wrote the letter; that she studied
the different handwritings of the persons connected with her hus-
band's business—clerks' pay rolls and receiver—and in various other
ways had devoted her attention to the subject of handwriting. It
is evident from her testimony that she is a very capable and intelli-
gent business woman. She seems, therefore, fairly to fall within
the definition of an expert, as defined by the authorities. Lawson
on Expert & Opinion Evidence, p. 195, rule 35, and cases cited.
Having qualified herself as an expert, was she entitled to testify
as to the handwriting of Du Bois? As the question is presented, it
is somewhat novel. She had never seen Du Bois write, and did not
know his handwriting prior to the time she claimed to have seen
his signature upon the will. Du Bois was dead. He had been a
principal in the public schools, and his genuine handwriting ap-
peared upon numerous vouchers and pay rolls filed in the office of
the comptroller of New York City. His will was also produced.
These papers were all introduced in evidence as furnishing a stand-

ard of comparison with the signature she claimed to have seen attached to the will. After having made a thorough examination of these papers and documents, she was asked if, in her opinion, the signature attached to the will was in the handwriting of Du Bois. Objection was interposed to this question, the same was sustained, and the evidence was excluded. It is conceded, in the comparison of handwritings, where they rest in memory, based upon knowledge of the handwriting, that a comparison of such handwriting with the disputed writing presented for examination calls for a mental process by which the expert determines and announces his opinion. One condition is the memory; the other, the present writing, in respect to which he is called upon to testify. At common law it has been said that there were three classifications, in either of which a person might testify respecting a disputed handwriting. One is where the witness had seen the paper written, or its authenticity had been acknowledged; second, "by witnesses familiar with the handwriting of the person charged to be the writer, and who were able to testify, from their familiarity with his handwriting, to a belief respecting the genuineness of the handwriting in question"; the third, comparison between the disputed writings and others. The second of these rules alone has application to the present question. The statutes which have been passed, regulating this subject, are learnedly discussed and commented upon by Werner, J., in People v. Molineux, 168 N. Y. 321, 328, 61 N. E. 286, 62 L. R. A. 193. Therein the learned judge reached the conclusion that the statutes had not limited, but had served to enlarge, the common-law rule, as he exhaustively points out.

In principle, I am of opinion that this case falls within the second subdivision of the rule announced at common law, and that the evidence offered under such rule was admissible. Where the witness has seen the handwriting of the person whose writing is the subject of dispute in a letter or other writing, he may testify therefrom that he knows the handwriting of such person, and he is not incompetent as a witness by reason of the fact that the signature which he saw was made before the controversy arose in which the handwriting became the subject of dispute. However dim the memory may become by lapse of time, yet, if the witness be then able to state that he knows the handwriting, he is competent to testify to such fact, even though years may have elapsed. Such condition goes to the weight of the proof, not to its competency. Such a situation is quite vividly described by Hand, J., in Miles v. Loomis, 75 N. Y. 288, 31 Am. Rep. 470. Therein the learned judge said:

"Evidence of handwriting, it is universally conceded, may be opinion merely. It is as universally conceded that a witness who has either ever seen the party write, or who, not having seen him write, has received letters from him which have been 'acted upon' by him as genuine, is competent to give opinions as to his handwriting. And this competency is not affected by the lack of frequency of observation, the length of time which has elapsed since the writing was seen, or the slightness of the correspondence, although the weight of the opinion will, of course, depend much upon these circumstances. From what in these cases is the opinion derived, if not from a mental comparison

·of hands? The signature is presented to the witness, and his only means ·of forming an opinion upon it is by recalling with more or less distinctness to his mind images of the signatures he has either seen made or attached to letters received, and comparing them with the one presented for his opinion. This is certainly a 'comparison of hands,' and, in my judgment, no favorable ·distinction as to accuracy or safety can be made between such a mental pro- ·cess and that of the expert who has become quick by practice in detecting identity of hands, and also compares in his mind and with his eye the one in ·question with other signatures as certainly genuine as those which the ·ordinary witness has seen written or received in letters. The comparative weight of the two kinds of evidence is not the question under consideration. The opinion of the ordinary witness, founded only upon a mental comparison ·of the disputed writing with a single signature seen by him twenty years be- fore, would be worth little, but it would undoubtedly be competent. Jackson ex dem. v. Van Dusen, 5 Johns. 144, 4 Am. Dec. 330; Eagleton v. Kingston, 8 Ves. 473. So the opinion of an expert founded upon a comparison with but one or two genuine signatures should not, perhaps, be regarded as of much value, but it still has every claim, in principle, to competency possessed by the other. Nor does the distinction sought to be raised by Lord Denman in Doe v. Suckermore, 5 Ad. & Ell. 737, between an opinion of an expert who has previously examined other genuine signatures put in evidence, and then is called to speak as to genuineness from his knowledge of the signature thus .gained, without actual comparison before the court, and one given upon an ·examination or comparison in court of the signatures, and without any pre- vious knowledge, seem, on scrutiny, to be well grounded or practicable. It would be impossible to draw a line between these processes. It is undoubt- ·edly true that the opinion as to handwriting should depend not so much upon mathematical measurements and minute criticisms of lines, nor their exact ·correspondence in detail when placed in juxtaposition with other specimens, .as upon its general character and features, as in the recognition of the human face. But in the case of an expert, his mental image or idea of the genuine handwriting may become as clear and vivid and accurate by an examination ·of the other signatures on the instant as in the case of another, of less prac- tice or quickness of perception, after hours or days of study. The amount of :knowledge gained by this study, and the length of time and frequency of op- portunity to gain it, affect the weight of the evidence, as in the case of the ·ordinary witness, but cannot properly decide its competency."

In principle the case which now confronts us is not different from the one where concededly the rule is applicable. The only differ- ence is that here the condition is exactly reversed. Mrs. Newcomb has acquired a knowledge of the handwriting of Du Bois from ad- mittedly genuine signatures upon various documents. Her mind now recalls with more or less distinctness the handwriting which she saw upon the will. By mental process she makes examination ·of the genuine handwriting of Du Bois then before her with the handwriting which she carries in her memory, taken from the will. By no possibility can there be difference in such operation between .a witness who brings the memory of a handwriting which he knew down to comparison with the one upon which his opinion is re- ·quired. The mental process in both is the same. The principle which establishes a right to the testimony in one case confirms it in the other. Both are precisely alike, from which is evolved the ·opinion, and, if one is admissible, it is difficult to see why the other is not. We are not now discussing the weight of such testimony, ·only its competency. The question was precisely decided by the Supreme Court of Kansas in Abbott v. Coleman, 22 Kan. 250, 31 Am. Rep. 186. It was also considered in Guyette v. Bolton, 46 Vt. 228. Therein the evidence was rejected because it did not ap-

pear that the witness was qualified to make a comparison. It was not doubted, however, but that the testimony was competent.

It is said that such rule may not be applied for the reason that the testimony thus given is one-sided, and that there is no opportunity to contradict it. This must always be said of a witness giving testimony where the conditions do not admit of its contradiction. Confessedly Mrs. Newcomb is competent to testify to the signature of Groser, because she knew his handwriting; and it is equally true that the respondents are powerless to contradict her upon such subject, assuming that they are not able to produce the will. Such rule has never been applied to testimony otherwise competent. It may be a misfortune that existing conditions do not permit the contradiction of a witness, but such rule has no bearing whatever upon the competency of his testimony. This is clearly illustrated by the provisions of section 829 of the Code of Civil Procedure. Such statute was made necessary in order to close the mouth of one person against another who was dead. Within the authorities, therefore, I am of the opinion that the testimony of Mrs. Newcomb respecting the handwriting of Du Bois was competent and should have been received. If I am right in this conclusion, then it follows, within the provisions of the Code to which we have called attention, that the evidence would be sufficient to establish the factum of the will; and, if so, then its contents can be established if the strength of memory of Mrs. Newcomb, who read it, is sufficient to reproduce it. If I am right in this conclusion, it also necessarily follows that it may be established as a lost or destroyed will, and if so, and if it revoked the will propounded for probate, it will defeat it as a will, and, if its contents can be established, it may be proved to be the proper instrument for probate. However this may be, it seems clear to my mind that the evidence which was rejected by the learned referee was improperly rejected, for which reason the decree admitting will No. 1 to probate should be reversed, and a new hearing had.

VAN BRUNT, P. J. In view of the misapprehension of the scope of the prevailing opinion by the learned justice who writes the dissenting opinion, it seems to be necessary to say a word or two in reply, in order that his assumptions as to the rules contended for in the prevailing opinion shall not pass unchallenged.

The learned justice writing the dissenting opinion states that it is asserted in the prevailing opinion that, "if the revoking clause be contained in a subsequent will, the factum of such will must be established in like manner and strength as would entitle it to be probated, had it been presented to the court for such purpose." I think that the prevailing opinion will be searched in vain for even a hint at any such proposition. Upon the contrary, that opinion proceeds upon the theory that common-law proof of the execution of the will was sufficient. This position was conceded by the counsel for the respondent, and it was held that no part of the second will could be read in evidence, because there was no proof whatever of

its execution as a revoking instrument; the evidence falling short of proof that any two persons subscribed the will as witnesses.

The learned justice further announces a proposition which is nowhere contested in the prevailing opinion, although it would seem that he had the impression that such was the case. He states that in certain cases the attestation clause of the will raises a presumption that the requirements of the statute in respect to signature, acknowledgment, publication, and request to the witnesses to sign have been complied with. And he cites the Matter of Nelson's Will, 141 N. Y. 152, 36 N. E. 3, and Matter of Cottrell, 95 N. Y. 329. He might also have cited the case of Peck v. Cary, 27 N. Y. 9, 84 Am. Dec. 220—a case which he singularly overlooked on this point. But in each of these cases there was complete proof of the signature of the two witnesses whose names were subscribed to the attestation clause.

The next proposition which seems to need attention is the claim that the conversation which the testator had with Mrs. Newcomb on the 28th of March, 1890 (the will in question having been executed on the 27th of December, 1889, three months before), was part of the res gestæ. He says, "Those declarations certainly were a part of the res gestæ connected with that will, and, as such, within the authorities which we have cited, evidence relating thereto was admissible." What he means by "were a part of the res gestæ connected with that will," it is difficult to comprehend. The only evidence which pertained to revocation, so far as that will is evidence of revocation, was its execution, and certainly those declarations were no part of the res gestæ of the execution; and the very authority which he quotes states that the declarations of the deceased, tending to show that a written will has been revoked, are open to the same objection unless they accompany some act which the statutes prescribe. The testator, at the time he made the declaration to Mrs. Newcomb on the 28th of March, 1890, was doing no act prescribed by the statute as a requisite for revocation.

The only other proposition to which attention ought to be called is the claim that Mrs. Newcomb was not only qualified to testify as an expert in handwriting to Du Bois' signature, but also that she did not testify. There is not a particle of evidence in the record, from beginning to end, tending to show that she was ever asked any question, as an expert, as to Du Bois' signature. It is true that she was asked about her experience in handwriting; but no question whatever was put to her as an expert, and, what is more, the learned counsel for the appellant distinctly asserted in his points that her evidence was not claimed to be admissible upon the ground that she was an expert. The whole reasoning by which the learned dissenting justice attempts to support the qualification of Mrs. Newcomb as an expert has no foundation whatever. If there is one thing absolutely necessary to support the evidence of an expert, it is that the premises upon which the expert bases his opinion shall be before the court and jury. And this is necessary for the reason that the jury, or, if the trial is had before the court without a jury,

the court, is not bound by the opinion of any expert. If the opinion, based upon the premises which are before the court or jury, does not commend itself to their judgment, they may reject it without any contradictory testimony. The jury are entitled to have before them the grounds upon which the expert forms his opinion. Where a physician is asked for his opinion in regard, for example, to the permanency of an injury, he must state the grounds upon which he forms his opinion, and then the jury can judge as to whether his opinion is based upon existing conditions. So, in regard to hand-writing, the expert must produce before the jury the writings compared. The jury has the right to inspect them, to examine the writing—both the one disputed and the one with which it is compared, in order that they may see whether the premises upon which the expert bases his opinion have any foundation in fact or not. They also have the right to compare for themselves, and to form a judgment of their own. And no case can be found where an expert has been allowed to testify where the principal premise rests solely in his imagination.

PATTERSON, O'BRIEN, and INGRAHAM, JJ., concur.