WILLIAM M. CLARK v. WILLIAM J. TURNER ET AL.

FILED JANUARY 7, 1897. No. 6857.

1. **Wills: PROOF OF CONTENTS.** The contents of a lost will cannot be proved solely by the declarations of the testator.

2. ———: ———. The testimony of a witness as to the contents of a will, his knowledge being derived from the testator's reading the will to him, and not from having himself inspected it, is in effect only testimony as to the testator's declarations.

3. ———: ———. Such declarations, it seems, are admissible to corroborate more direct evidence.

4. ———: CONTEST: ATTORNEYS' FEES. Attorneys' fees cannot be allowed in the contest proceedings to unsuccessful proponents of a will. If such proponents are entitled to reimbursement out of the estate, it must be had in the course of administration, and after administration granted.

ERROR from the district court of Lancaster county. Tried below before HALL, J. *Affirmed.*

See opinion for statement of the case.

*J. W. Deweese, F. M. Hall,* and *G. M. Lambertson,* for plaintiff in error:

Proponents had a right, after having shown that a will was left by testator and that it had been lost, stolen, or destroyed, to prove its contents by offering what purports to be a copy, to show that it is a copy, and to have the same probated. (*In re Page,* 118 Ill., 576; 1 Redfield, Wills, 349; *Davis v. Sigourney,* 8 Met. [Mass.], 487; *Crowley v. Crowley,* 80 Ill., 469; *Jackson v. Vickory,* 1 Wend. [N. Y.], 406; *Dan v. Brown,* 4 Cow. [N. Y.], 483; *Doran v. Mullen,* 78 Ill., 342; *Thornton v. Thornton,* 39 Vt., 122; *Sugden v. Lord St. Leonards,* 34 L. T. Rep. [Eng.], 372; *Southworth v. Adams,* 11 Biss. [U. S.], 257.)

The presumption that a will is revoked because not found in the place where it was deposited by the testator may be rebutted. (*Gaines v. Hennen,* 24 How. [U. S.], 553.)

The presumption of revocation does not arise when no immediate search was made for the will in the place where it was last seen and deposited, and this is especially true where those interested in its loss or destruction took the receptacle in which it was deposited into their exclusive possession and custody, against the known wishes of the testator, and prevented the executors, legatees, and devisees in the will from examining it until its contents were rifled and destroyed by an alleged burglar. In such a case the burden of proof is on the contestant, who took possession of the receptacle, to show that the will was not in it at the time he took the receptacle into his custody.  (*Finch v. Finch*, 16 L. T. Rep. [Eng.], 268; *Podmore v. Whatton*, 3 Sn. & Tr. [Eng.], 449; *Sugden v. Lord St. Leonards*, 34 L. T. Rep. [Eng.], 372; *In re Page*, 118 Ill., 576; *Gaines v. Hennen*, 24 How. [U. S.], 553.)

Fees of proponent's attorneys, as well as costs of court, ought to be paid out of the estate.  (*Seebrock v. Fedawa*, 33 Neb., 413; *Mathis v. Pitman*, 32 Neb., 191; *Bradford v. Boudinot*, 3 Wash. [U. S. C. C.], 122; *Compton v. Barnes*, 4 Gill [Md.], 55; *Henderson v. Simmons*, 33 Ala., 291.)

*Sawyer, Snell & Frost*, and *Charles O. Whedon*, contra:

There was no competent testimony as to the contents of the will alleged to have been made by Dr. Turner.  (*Edington v. Mutual Life Ins. Co.*, 67 N. Y., 185; *Feeney v. Long Island R. Co.*, 5 L. R. A. [N. Y.], 544; *Pennsylvania R. Co. v. Marien*, 7 L. R. A. [Ind.], 687; *Heuston v. Simpson*, 115 Ind., 62; *Westover v. Ætna Ins. Co.*, 99 N. Y., 56; *Loder v. Whelpley*, 111 N. Y., 239; *Parker v. Carter*, 6 Am. Dec. [Va.], 513; *Morris v. Cain*, 1 So. Rep. [La.], 797; *Bacon v. Frisbie*, 80 N. Y., 394; *Root v. Wright*, 84 N. Y., 72; *Koontz v. Owens*, 18 S. W. Rep. [Mo.], 928; *Ransom v. Schmela*, 13 Neb., 73.)

The contents of the alleged will could not be shown by the declarations of testator.  (*Chrisholm v. Ben*, 7 B. Mon. [Ky.], 412; *Colligan v. McKernan*, 2 Dem. [N. Y.], 421; *Mercer v. Mackin*, 14 Bush [Ky.], 442; *Clark v. Morton*, 28

Am. Dec. [Pa.], 670; *Gay v. Gay*, 14 N. W. Rep. [Ia.], 238; *Waterman v. Whitney*, 11 N. Y., 157; *Boynlan v. Meeker*, 28 N. J. Law, 274; *Behrens v. Behrens*, 25 N. E. Rep. [O.], 209; *Morgan v. Burrows*, 45 Wis., 211; *Woodward v. Goulstone*, 11 App. Cas. [Eng.], 478; *Hunter v. Gardenhire*, 13 B. J. Lea [Tenn.], 662.)

The contents of the alleged will was not shown by that positive testimony required by law. (*Southworth v. Adams*, 11 Biss. [U. S.], 260; *Davis v. Sigourney*, 8 Met. [Mass.], 487; *In re Johnson's Will*, 40 Conn., 589; *Bauskett v. Keitt*, 22 S. Car., 187.)

The ruling in disallowing fees for attorneys was correct. (*Mumper's Appeal*, 3 Watts & S. [Pa.], 441; *Royer's Appeal*, 13 Pa. St., 569; *Andrews v. Administrators*, 7 O. St., 152; *Collyer v. Collyer*, 4 Dem. [N. Y.], 53; *Brown v. Vinyard*, 1 Bailey's Eq. [S. Car.], 460.)

IRVINE, C.

John J. Turner was an elderly citizen of the city of Lincoln, blessed with a pious disposition and a considerable quantity of this world's goods. He died March 1, 1890, leaving him surviving two sons, William J. Turner and R. Morris Turner. Some time after his death William M. Clark and Nahum S. Scott propounded for probate what purported to be a copy of John J. Turner's last will and testament, it being alleged that said will had been deposited in a valise belonging to the testator, which, after his death, had been delivered to his sons, and that thereafter it was claimed that the house in which the valise had been kept was burglariously entered, the valise cut open, and its contents extracted. The probate was contested by the two sons. The result of the proceedings in the county court does not appear from the record. The case was, however, appealed to the district court, where, as a result of what appears to have been a third trial there, a verdict was rendered in favor of the contestants. Judgment was rendered denying probate and the proponent Clark, the proponent Scott hav-

ing died pending the proceedings, prosecutes to this court proceedings in error to reverse that judgment.

The copy of the will, as propounded, is as follows:

"I, John J. Turner, of Lincoln, Nebraska, being of sound and disposing mind and memory, aged ——, do hereby declare this to be my last will and testament, as follows:

"First—I will that my debts and reasonable funeral charges be paid.

"Second—I give and bequeath to the Board of Missions for Freedmen of the Presbyterian Church of the United States of America the value of the note of R. Morris Turner for four thousand five hundred dollars, secured by mortgage on lot three (3) in block one hundred and twenty-nine (129), city of Lincoln, Lancaster county, Nebraska, less two thousand dollars borrowed at the First National Bank of Lincoln, Nebraska, and paid over to said board.

"Third—I give and bequeath to the Board of Foreign Missions of the Presbyterian Church in the United States of America the value of a note made by William J. Turner to me for the sum of five thousand seven hundred dollars, less the amount necessary to pay my note of $2,000 at the First National Bank of Lincoln, Nebraska, for which this note of $5,700 dollars is pledged as collateral security.

"Fourth—I give and bequeath to Karen Rootham the entire use of my double house on North Twelfth street, east of the university, during her natural life, and in case the house shall be destroyed she may use the entire amount of the insurance to rebuild the same, or she may receive one-half of the amount of the insurance and release her interest and claim upon the property. She may assign and dispose of her entire interest in rents and use of said house at any time, and at her death the said property shall go to my two sons, William J. Turner and R. Morris Turner.

"Fifth—I give, grant, and bequeath to my son, R. Mor-

ris Turner, the house and lot where I now reside, with all the furniture and family library therein; also any balance of the note of R. Morris Turner not bequeathed or paid at the time of my death.

"Sixth—I give and bequeath to my son, William J. Turner, all my medical books, instruments, and medicines, books of account, and accounts belonging to me at the time of my death.

"I hereby constitute and appoint Captain N. S. Scott and William M. Clark to be the executors of this my last will and testament, hereby revoking all former wills by me made.

"Witness my hand and seal this —— day of ——, 1888.

"JOHN J. TURNER.

"FRED SCHMIDT.

"GEO. A. HAGENSICK.

"The foregoing instrument was on the day of the date thereof signed, sealed, published, and declared by the testator therein named, John J. Turner, as and for his last will and testament, in the presence of us, who, at his request and in his presence, and in the presence of each other, have hereunto subscribed our names this —— day of ——, 1888.          FRED SCHMIDT.

"GEO. A. HAGENSICK.

"CODICIL TO MY LAST WILL AND TESTAMENT.

"I, John J. Turner, hereby will and direct that my executors shall pay to my brother, living in ——, out of the interest of William J. Turner's note the sum of three hundred and fifty dollars, to be used by him as a loan for the term of five years, without interest. At the expiration of five years to be collected and paid over to the Board of Foreign Missions of the Presbyterian Church in the United States of America.          JOHN J. TURNER.

"Dated December ——, 1889.

"Witness:

"SARAH TURNER.

"KAREN ROOTHAM."

A few remarks in regard to the subject-matter of the testator's property may not be inappropriate, preliminary to the statement of other facts in the case. The alleged testator, John J. Turner, referred to usually in the evidence as Dr. Turner, by which term we shall hereafter designate him, was, at the time of his death, and at the time it is claimed this will was executed, seized of the land described in the will, and also of another lot in the city of Lincoln, not thereby disposed of. He had previously owned two other lots in the city of Lincoln, one of which he had conveyed to his son, R. Morris Turner, receiving in consideration for the conveyance the latter's note for $4,500, secured by mortgage on the lot. The other lot he had, at about the same time, conveyed to his son, William J. Turner, receiving in return the latter's note for $5,700. It appears from the evidence that the object of both these conveyances was to provide annuities by virtue of an arrangement entered into between Dr. Turner and his sons, whereby, in order to relieve the doctor of the burden of caring for the property, the conveyances were made to his sons, they to pay interest on the notes during the doctor's lifetime. They contend that upon his death interest was to cease, and the principal of the notes was not to be paid. These are the notes referred to in the second and third paragraphs of the will propounded. Dr. Turner's wife died in 1883. Soon thereafter one Karen Rootham, or, as she herself signs her name, Karenhappech Rootham, a maiden of mature years, became installed in Dr. Turner's home as his housekeeper. It is to her that the fourth paragraph of the alleged will relates. Mr. Clark and Mr. Scott, who are named as executors, were prominent members of the Presbyterian church, of which Dr. Turner was also a member. Captain Scott was a lawyer and seems to have been Dr. Turner's legal adviser. Dr. Turner seems to have acquired somewhat of a habit of making wills, as there is evidence, chiefly from entries in his diary, of his having executed several such instruments in the last

decade of his life. There is a little evidence of this character tending to show the execution by him of a will later than the one here in controversy, but this evidence would not be of such a character as to justify the rejection of this will were this one satisfactorily established. It is claimed that the will propounded was executed in the summer of 1888, and it quite satisfactorily appears that Dr. Turner during that summer did execute a will, which was witnessed by Fred Schmidt and George A. Hagensick. Neither witness pretends to have been informed as to the contents of the will. There is evidence to the effect that on one occasion, and perhaps on three occasions, between the time when this will was executed and Dr. Turner's death, the doctor exhibited to Miss Rootham an envelope, and also, without displaying its contents, a paper enclosed in that envelope, telling Miss Rootham that it was his will and calling her attention to the fact that he deposited it in a certain valise, which he hung in a closet in his house. He also placed the key to the valise in a drawer and called her attention to that fact. He left with her an envelope marked "Miss Karen Rootham (after my death). J. J. Turner." This envelope when opened contained a direction to Miss Rootham "To give my valise key to Mr. William Clark, who can take the note case, which contains all valuable papers, also any money in my old book, and the key of the house to my son, R. Morris Turner." Mr. Clark was unfortunately absent from Lincoln at the time of Dr. Turner's death. Immediately after his funeral the two sons of Dr. Turner found Miss Rootham in possession of the valise. At their solicitation she, exhibiting some reluctance, delivered the valise to William J. Turner, both sons giving her a written receipt therefor. The valise was placed in William J. Turner's house. Early in May it was announced that this house had been entered by burglars and a number of articles abstracted. The account of this affair as given by William J. Turner, and corroborated in most particulars by his wife and brother, is that with his

family he made an evening call upon his brother and returned home about half past ten.   During his absence the house had been entered through a basement window; some jewels had been stolen; this valise had been cut open and papers, evidently abstracted therefrom, were found scattered about the floor; no will was found among these papers.   From the foregoing facts we think the proponents raised a strong presumption, if they did not make conclusive proof, that a will by Dr. Turner had been executed; that it was placed in the valise, and that it was there at the time of his death.   Without desiring to cast any unfavorable reflection upon any of the parties concerned, we may be, perhaps, permitted the remark that the unusual conduct of the burglar in seeking out this valise from an upstairs closet, cutting it open, and scattering its contents over the floor, does not tend in our minds to raise any inference that no will was among the papers so abstracted, although it does not appear that any paper belonging to Dr. Turner, and known to be in existence, was actually carried away by the felon.   In addition to the foregoing, there appeared certain declarations of Dr. Turner extending to a short time before his death, from which it would appear that the will had not been revoked.   Such declarations we think admissible for this purpose, as will be hereinafter indicated.

The difficulty lies in the proof which was offered as to the contents of the will.   It does not appear that any person ever read the will, or was aware of any portion of its contents except through statements made by Dr. Turner.   The strongest evidence is that of Captain Scott, to the effect that Dr. Turner came to his office declaring that he had made his will, and then read it to Captain Scott, asking him whether it was in legal form.  Captain Scott was blind and therefore did not see the will himself, so that his testimony amounts to nothing more than a repetition of Dr. Turner's declarations as to its contents. In addition to this there is evidence of a few declarations made to others subsequently as to the effect of different

provisions contained in the will. Dr. Turner told Mr. Clark that he and Captain Scott were named as executors. He told Karen Rootham that he had provided for her; he told his pastor, Dr. Curtis, something in regard to the bequests to the two missionary boards; beyond this there is no evidence as to the contents of the will. Mr. Clark had, about the time the will was executed, obtained copies of the two notes referred to. Just before the will was propounded for probate he obtained from the records a description of the property covered by the Morris Turner mortgage. The copy propounded was made up by Captain Scott's dictating to Mr. Clark from recollection of Dr. Turner's declarations, and Mr. Clark's filling in the description of the notes and mortgage from the memoranda in his possession. The attestation clause was copied from a form book. We do not think that this was sufficient evidence of the contents of the will, and from this it follows that the verdict was the only one which could properly be returned upon the evidence. It becomes, therefore, unnecessary for us to consider any special assignments of error relating to other branches of the case.

The precise question does not seem to have often arisen. We think all the cases hold that the declarations of a testator may be received in evidence to prove the existence of a will and in proof of issues relating to the testator's competency or to undue influence, but it has been doubted whether such declarations may be received to establish a revocation. It follows that in all proceedings to probate a lost will, such declarations are admissible in evidence because the existence of the will must necessarily be established by some such indirect method. The declarations having been admitted for that purpose their sufficiency to establish the contents of the will is another question.

In England, prior to the leading case of *Sugden v. Lord St. Leonards*, L. R., 1 P. D., 154, it was considered that the declarations were not admissible as tending to

prove the contents. *Doe v. Palmer*, 16 Q. B. [Eng.], 747, turned upon the question whether an interlineation had been made before or after the execution of the will, and it was held that the testator's declarations as to his intentions made before the execution of the will were admissible, but the declarations made after its execution were not. *Quick v. Quick*, 3 Swab. & T. [Eng.], 442, was a case startlingly like that at bar in some points. The sole evidence of the contents of the will was the testator's declaration. There was the same fact of the will being kept in a bag and of its being taken by burglars. The court held that there was a failure of proof, holding also that the declarations were incompetent. The court of appeals, however, in *Sugden v. Lord St. Leonards*, overruled *Quick v. Quick* and distinctly held such declarations admissible. The will in question was, however, proved by much other evidence; Miss Sugden, the testator's daughter, had not only heard the will read but she had herself read it a number of times and was able to testify in much detail as to its contents from such personal inspection; moreover, not less than eight codicils were found, the terms of these all tending to corroborate her as to the contents of the original will. In addition to this proof there was the evidence of the testator's declarations as to the will's contents. The long and exhaustive opinions are directed only incidentally to the admissibility of the declarations. The crucial question having been whether all the evidence was sufficient to establish the will, the case, therefore, falls far short of holding that the contents of a lost will may be proved solely by the declarations of the testator. Its effect is merely that such declarations are admissible to corroborate more direct evidence. This is the construction given the case by the house of lords in *Woodward v. Goulstone*, 11 App. Cas. [Eng.], 469, where the declarations of the testator were held insufficient alone to establish the will. An intimation was given that *Sugden v. Lord St. Leonards* was not considered free from doubt and the question there

presented left open. The importance of interests involved in probate cases in England is such that the decisions of English courts on such subjects are entitled to great weight, and we may safely say that the result of the English cases is that the contents of a lost will cannot be established solely by the declarations of the testator, although such declarations are now deemed admissible for the purpose of corroboration.

The American cases relied on to suport proponents' theory are, when examined, in strict accordance with the English rule. *In re Page*, 118 Ill., 576, expressly follows *Sugden v. Lord St. Leonards*, and comes within the true doctrine of that case, because the declarations in that case merely went to corroborate the testimony of the lawyer who drew the will and who produced a copy thereof. *Southworth v. Adams*, 11 Biss. [U. S.], 256, *In re Hope*, 48 Mich., 518, and *In re Lambie*, 97 Mich., 49, are cases of the same character, the declarations being corroborative merely, and not relied on in themselves to establish the will. In *Colligan v. McKernan*, 2 Dem. [N. Y.], 421, a will had been propounded for probate. It was contended that there was a subsequent will revoking the former one, but the subsequent will was lost. The evidence offered to establish the second will consisted in the testimony of a clerk in a lawyer's office, who heard the scrivener read it in the presence of the testator at the time of its execution. The court distinctly held that this testimony was merely hearsay, relating, in fact, to the scrivener's declarations, and was not equivalent to testimony by one who had himself read the will. In *Clark v. Morton*, 5 Rawle [Pa.], 235, the supreme court of Pennsylvania held that the contents of a will cannot be established by declarations of the testator, in the absence of the *corpus* of the will and of all evidence that the witness had himself seen it. The court said that to permit a will to be so established would defeat the object of the statutes requiring wills to be written. In *Chisholm's Heirs v. Ben*, 7 B. Mon. [Ky.], 408, the testimony was of the same

character as in this case. The will had been read by the testator to the witness, and there were subsequent declarations by him as to its contents. The court rejected this evidence as insufficient. *Mercer's Administrators v. Mackin,* 14 Bush [Ky.], 434, reaffirms *Chisholm v. Ben.* The argument has been frequently advanced that such declarations are admissible as self-disserving declarations of a decedent. *Mercer v. Mackin* and *Clark v. Morton* discuss this proposition, but demonstrate that such declarations are not admissible on that ground. *Chisholm v. Ben, supra,* intimated that on adequate proof that the will had been fraudulently suppressed by the heirs, the evidence referred to might be sufficient by virtue of the maxim *"Omnia præsumuntur contra spoliatorem."* This maxim is not easy to apply. It has sometimes been held to justify the production of slighter proof than would otherwise be required. Its most frequent application is for the purpose of allowing secondary evidence. It would certainly be very dangerous to extend it so far as to relieve a party charged with proving the contents of a written instrument from all obligation to produce some evidence of a competent character; but this phase of the case was not submitted to the jury by any instruction given or asked, at least so far as the contents of the will are concerned. The general verdict for the contestants precludes us from examining the evidence on this point on the theory that spoliation by the contestants was established. The policy of the statute of wills, like the statute of frauds, is that it is better that occasional injustice should be done, in exceptional cases, through a failure of legal proof, than that transactions within the statutes should in all cases be left to the uncertainties of parol evidence. So the courts in giving effect to the statutes should pursue the same policy, and should avoid meeting hard cases by adopting rules which, generally applied, would defeat the object of the legislature. On no subject, perhaps, are statutes so strict in requiring a writing executed and attested in certain forms as in

the case of wills, and while it is firmly established that a lost will may be proved by secondary evidence, the courts have always required such evidence to be direct, clear, and convincing. As said by the supreme court of the United States in *Lea v. Polk County Copper Co.*, 21 How., 493: "Courts of justice lend a very unwilling ear to statements of what dead men have said." Such evidence is always considered dangerous, and subject to the closest scrutiny. We think it would be in the highest degree dangerous, and would be violative of the object and spirit of the statute, should we hold that the existence and contents of an alleged will might be established solely by testimony of the testator's declarations. Notwithstanding *Sugden v. Lord St. Leonards* and the other cases in that line, we believe the language of the court of appeals of Kentucky in *Chisholm v. Ben* remains true: "The books of reports contain many cases in which wills lost or destroyed have been offered for probate upon parol or other secondary evidence of their contents, and many in which such wills were established, but in an examination of these cases, as extensive as opportunity would allow, we have found none in which there does not seem to have been the evidence of witnesses who knew, or might be presumed to have known, the contents of the will from their own inspection; none in which the declarations or even professed reading of the decedent have been held to be alone sufficient on this point; and none which would sanction their admission upon the question of the contents of the will with any other effect than as merely corroborative of the more direct evidence." As already indicated, this view leads to affirmation of the judgment, because the verdict was the only one warranted by the evidence.

An application was made for the allowance of attorneys' fees to the proponents. This application the district court denied, and the ruling is assigned as error. In two cases such an allowance has been made on behalf of defeated contestants when the will was admitted to

probate.   In *Seebrock v. Fedawa*, 33 Neb., 413, the allow-
ance seems to have been made on the ground that there
were reasonable grounds for contesting the will.   In
*Mathis v. Pitman*, 32 Neb., 191, the allowance was based
on the construction of sections 42 and 44 of chapter 20,
Compiled Statutes, the latter section providing that in
appeals in probate matters, if it shall appear that the
appeal was taken vexatiously or for delay, the court
shall adjudge the appellants to pay the costs, including
an attorney's fee to the adverse party.   It seems to have
been the opinion of the court that this language involved
the alternative that if the appeal be not taken vexatiously
or for delay, the costs shall be taxed to the estate.   The
record before us does not show which party appealed
to the district court.   In *McClary v. Stull*, 44 Neb., 175,
such an application was denied, the court remarking,
however, that "courts of equity have frequently assumed,
when dealing with funds brought directly within their
control, to order payment therefrom of fees to counsel for
the adverse party."   Both in *Mathis v. Pitman* and in *See-
brock v. Fedawa* the will, as a result of the proceeding, was
admitted to probate and administration established, the
parties charged with administering the estate being be-
fore the court, so that the fund may be said to have been
"brought directly within the control" of the court, ac-
cording to the statement in *McClary v. Stull*.   This feature
appears in all the cases from other states cited by the
proponents.   Thus, *Henderson v. Simmons*, 33 Ala., 291,
was decided on the final accounting of an administrator,
the question arising in the administration of the estate
and not in the proceeding leading to the probate of the
will.   In *Compton v. Barnes*, 4 Gill [Md.], 55, the will had
been probated and letters testamentary granted to the
executors.   The contest was by means of a caveat there-
after filed, and the holding of the court was that the will
having been probated and letters testamentary granted,
it became the duty of the executors to defend the will,
under which they were already acting, and that they

were, therefore, entitled to compensation. In *Bradford v. Boudinot*, 3 Wash. [U. S. C. C.], 122, the facts were the same and the proceeding was by original bill, after the will had been defeated, for an accounting against the executor, who had qualified in pursuance of its probate. The court held that he was not an executor *de son tort*, and was, consequently, entitled to reimbursement for his expenses in defending the will. We can find no instance where no administration had been granted and unsuccessful proponents of a will have been allowed counsel fees out of the estate in the contest proceedings. Inasmuch as the statute (Compiled Statutes, ch. 23, secs. 137 and 138) makes it the duty of persons named as executors to propound the will for probate, and provides a penalty for neglecting to do so, it seems reasonable that they should not be compelled to perform this duty at the peril of incurring the expense thereof against themselves should probate be denied, at least where they have acted in good faith. But we are satisfied that in this case no allowance can be made. The judgment simply denies probate. No administration is granted and we have not before us any person now charged with the duties or powers of a personal representative of the deceased, nor has by this proceeding the estate itself been impounded. If such application be proper, it should be made in the county court after administration shall have been granted.

JUDGMENT AFFIRMED.