Argued 7 May, decided 9 July, 1907.

**MILLER'S WILL.**

LUIS *v.* MUHRBACK.

90 Pac. 1002.

ESTABLISHMENT OF LOST WILLS—BURDEN OF PROOF.

1. Where a will is shown to be lost, secondary evidence is admissible to show its contents, the burden being upon the proponent to clearly establish its execution.

LOST WILL—PRESUMPTION OF REVOCATION FROM POSSESSION BY TESTATOR.

2. If, when last seen, a will was in the possession of the testatrix, and cannot be found, it will be presumed, in the absence of other evidence, that she destroyed it.

SAME—PRESUMPTION AS TO REVOCATION FROM POSSESSION BY STRANGER.

3. In a proceeding for the probate of a lost will, where the possession of the will is shown to have been intrusted to a third person, the burden of retracing it into the hands of the testatrix is upon the contestant.

WEIGHT AND SUFFICIENCY OF UNCONTROVERTED EVIDENCE.

4. Where a disinterested witness, who is in no way discredited by other evidence, testifies to a fact within his knowledge, which is not in itself improbable, or in conflict with other evidence, the facts so given will be taken as legally established.

COMPETENCY OF INTERESTED PERSON.

5. The testimony of witnesses is not to be disregarded merely because they are interested in the result.

WILLS—PROBATE—EVIDENCE—BURDEN OF PROOF.

6. Where, in a proceeding to probate a lost will, it is shown that the will was duly executed, the presumption of law is strong in its favor, and its revocation must be clearly proven.

LOST WILL—COMPETENCY OF DECLARATIONS OF TESTATRIX CONCERNING
    SUCH WILL AND HER FEELINGS TOWARD DEVISEES.

7. In a proceeding to probate a lost will, declarations made by the decedent subsequent to the execution of the will, and within a reasonable time prior to her death, showing it to have been deposited with a third person, and that it was still there to within a few days of her death, and declarations showing her affection for the devisees, with no change in her feelings toward them, when corroborated by direct evidence that after making the declarations she had no opportunity of withdrawing the will, are admissible as a basis for an inference that the will had not been returned to her possession or canceled.

From Union. ROBERT EAKIN, Judge.

Statement by MR. COMMISSIONER KING.

This was a proceeding in the County Court of Union County, Oregon, for the purpose of proving an alleged lost will of Ferena Miller, who died in that county November 19, 1900. The petition for probate was filed by Edward Luis July 13, 1903, alleging that Ferena Miller died on the date and in the county mentioned, leaving a large estate therein, consisting of both real and personal property, with no lineal descendants surviving her; that the petitioner and his sister, Clara Luis, had made their home with decedent from their infancy, with the understanding that they should inherit all of the Miller property; that a will was executed bequeathing to the petitioner all of the personal property, together with the 40 acres of land upon which the dwelling and all other buildings were situated, and to him and his sister, Clara, share and share alike, all the remaining real property; that the land bequeathed to him is the N. W. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of section 29, with appurtenances, and the property devised to them jointly consists of the E. $\frac{1}{2}$ of the E. $\frac{1}{2}$ of

section 19, W. $\frac{1}{2}$ of S. W. $\frac{1}{4}$, S. E. $\frac{1}{4}$ of S. W. $\frac{1}{4}$ and S. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$ of section 20, N. E. $\frac{1}{4}$ of N. W. $\frac{1}{4}$ and N. W. $\frac{1}{4}$ of N. E. $\frac{1}{4}$ of section 29, all in township 5 S., range 39 E., W. M., in Union County, Oregon; that immediately after its execution the will referred to was deposited and left for safe keeping either with N. Tartar, since deceased, or with the First National Bank of Union, Oregon, but has been lost, and after diligent search cannot be found. Evidence was offered in support of the petition, resulting in an order being made by the county court to the effect that the will be admitted to probate.

On July 7, 1904, Jacob Muhrback, as contestant, filed a petition with the county court, praying that Luis be cited to appear and show cause why the order entered sustaining his petition should not be vacated, alleging that Ferena Miller died intestate, leaving no one capable of inheriting her estate, except contestant; that contestant is a brother of decedent, and that all her property descended to, and is inherited by, him under the laws of Oregon; that he is informed and believes that Luis, under an alleged will, claims to have succeeded to all the property of which she died seised, but, if such will was executed, it was revoked. Luis answered, admitting the residence and death of the decedent, and that she left no lineal descendants, but denied the other allegations. The cause, being at issue, was referred to H. R. Hanna as special referee for the purpose of taking the testimony therein, which was thereafter taken and reported to the court, after which (August 13, 1906) the county court set aside its former order, from which action an appeal was taken by proponent. The circuit court, on appeal, reversed the decree of the county court, sustained the allegations of the petition for probate, and decreed the legatees to be the owners, under the will, of the property alleged to have been bequeathed to each, as above described. From this decree, Muhrback appeals.

AFFIRMED.

For appellant there was a brief over the name of *Cochran & Cochran,* with an oral argument by *Mr. Charles Edgar Cochran.*

For respondents there was a brief with an oral argument by *Mr. Lewis Jay Davis.*

Opinion by MR. COMMISSIONER KING.

The evidence discloses that in the year 1864 Adam Miller, with his wife, Ferena Miller, settled upon what is known as Catherine Creek, in Union County, in this state, later removing to Clover Creek in that vicinity, where they afterwards continuously resided. Adam Miller died June 26, 1886, but his wife lived until November 19, 1900. Prior to the death of Adam Miller, being without children, they took into their home Edward Luis and his sister, Clara, the oldest of whom was about nine years of age, the boy being a nephew and the girl a niece of Mrs. Miller. Some time prior to 1886 an effort was made to adopt Edward, resulting in a failure on account of an irregularity in the proceedings, which oversight was not discovered until steps were taken to administer upon Adam Miller's estate. The children, however, continued their home with Mrs. Miller until of age, after which Clara married one Geo. A. Aughey, but Edward remained on the farm, devoting his full time and labor in its improvement. At all times after being taken into the Miller home, both he and his sister were treated as members of the family, and were recognized by the people in that vicinity as such. On the death of her husband Ferena Miller succeeded to all his estate. A few years afterwards she executed a will, in which Edward and Clara Luis were made her beneficiaries to share equally in all her property. A few years later, and after Clara married, this will was destroyed and revoked. After considerable delay she made a new will, being the one involved here. This will was executed in the office of C. H. Marsh, an attorney in Union, and witnessed by him and one Mrs. A. M. Tartar, who resided there. Before being signed, it was read in the presence of the witnesses to Mrs. Miller, who, after hearing it read, stated that the will was as she wanted it, and that it was her last will and testament. Marsh then inclosed the will in an envelope and delivered it to the testatrix, who, in company with Mrs. Tartar, went to the First National Bank of that place, and handed the envelope with will inclosed to "Will Wright," the cashier, who, after having her indorse instructions thereon, retained it for safe-keeping.

1. Under our Code (B. & C. Comp. § 791) a will must be in writing, except when made by a soldier or mariner. in active service, but, when in writing, secondary evidence is admissible to show its contents. Like any other written instrument, when shown to have been lost, it may be established on proof of such loss, the burden of which is on the proponent, and its execution must be clearly established, but, when this is done, it may be admitted to probate unless shown to have been revoked: 16 Enc. Pl. & Pr. 1065; 23 Am. & Eng. Enc. Law (2 ed.), 147; *Wallis* v. *Wallis,* 114 Mass. 510; Harris v. Harris, 26 N. Y. 433. Contestant insists that the will was destroyed and accordingly revoked by the testatrix, but this charge proponent denies, asserting that it was never withdrawn from the bank. On this issue the result of this suit depends.

2. If, when last seen, the will is shown to have been in the possession of the testatrix, and cannot be found, it must be presumed, in the absence of other evidence, that she destroyed it: 23 Am. & Eng. Enc. Law (2 ed.), 148; *Collyer* v. *Collyer,* 110 N. Y. 481 (18 N. E. 110: 6 Am. St. Rep. 405); *Behrens* v. *Behrens,* 47 Ohio St. 323 (25 N. E. 209: 21 Am. St. Rep. 820).

3. But, under our view of the evidence, the possession of the will is shown to have been intrusted to a third person, the bank, as a depositary. The burden, therefore, of retracing it into the hands of the testatrix is upon the contestant. Especially is this true when shown that within a short time before her death declarations were made by decedent to the effect that the will was still in existence and in the bank, after which she could not have had access to it: Thornton, Lost Wills, § 62; *Schultz* v. *Schultz,* 35 N. Y. 653 (91 Am. Dec. 88); *Dawson* v. *Smith,* 3 Houst. (Del.) 335; *In re Harris' Estate,* 10 Wash. 555 (39 Pac. 148).

It is conceded that the will, after being properly executed, was taken from the attorney's office by Mrs. Miller in company with Mrs. Tartar. As to what was afterwards done with it there is some controversy. Mrs. Tartar, a disinterested witness, testifies that, as soon as the will was executed, it was taken to the First National Bank of Union, Oregon, and there delivered to

"Will Wright," cashier; that she was present, heard the con-
versation between them, and saw the envelope with will inclosed
turned over to him; that no other persons were present at the
time; that she and Mrs. Miller were very intimate friends; that
Mrs. Miller was at that time visiting with her in Union; that
decedent had previously made a will, appointing "Mr. Dobbs"
administrator, but claimed to be dissatisfied with it, and said
that there was some little disturbance when she made it; that
she saw her destroy this first will by throwing it into the stove,
saying at the time: " 'Some of these days when the weather is
good you go with me and I will make a new one,' which I (Mrs.
Tartar) concluded to do"; and that the will here in question
was thereafter executed and left in the bank as stated.

It is insisted that this testimony is inconsistent with one of
the statements of the witness on cross-examination, when, in
answer to an inquiry as to whether she knew what became of the
last will, she stated:

"A. I could not tell you that. She took it home to Clover
Creek, 16 miles from here, and took sick and had her hip out of
joint, and I never was up there since.

Q. Was she ever back to your residence at any time after this
will was put in the bank?

A. Oh, yes, yes. She was here once and I can't tell. I
thought she was out of humor, and she had a little valise with
her, where she generally carried papers, and she didn't talk to
me anything about it. I don't know what she had in the valise.
She went to town. She was mad over something. Clara was
here and Ed was here, and she went to town. She was in the
house with me awhile and then took the valise and went off,
and I always believed in my own mind she took the will out of
the bank, because she said Ed and Clara told her to take that
will out of the bank—'that somebody might get it and cause
you a great deal of trouble and get everything you have got.'
'Well,' I says, 'a person wouldn't have common sense that would
speculate on anything like that.' She went off after she ex-
pressed herself that way, and she come back with the valise in
her hand, and never let go of it any more. She seemed to act
troubled."

In this connection it will be observed that, while Mrs. Tartar
was quite an intelligent witness, she was at the time of giving

her testimony 77 years old, and accordingly easily confused. Assuming the statement of the witness, as claimed, and as it first appears, indicates that the testatrix withdrew the will from the bank, it is evident that she only intended it as her opinion, for nowhere does it appear that she claims to have any direct knowledge to that effect, and it is manifest that she derives this opinion only from the circumstances there stated. The witness was evidently trying to evolve a theory by which she could account for the missing will. She was so firmly impressed with the idea that it was at the bank that she had called there for it, and insisted upon a thorough search being made at that place, to which request the bank officials responded without hesitation, but unsuccessfully. A search had been made by other banks and at various other places wherever deemed possible that it might be found, all without avail. She had seen the first will destroyed, witnessed the new one, and saw it deposited for safekeeping, and, all efforts in trying to solve the mystery of its disappearance having failed, she recalled the incident in Mrs. Miller's visit at her residence of a few years before, when she abruptly left the house, carrying a satchel, and soon returned, appearing worried, and as a result, on the impulse of the moment, concluded and gave it as her opinion or theory that Mrs. Miller had procured the will and taken it with her to Clover Creek. Unless this opinion expressed under these circumstances can have sufficient weight to demonstrate otherwise, it must be held that thus far it is shown that the will, when last seen, was in the possession of a third person, the bank, and that contestant has not overcome the presumption recognized by our statute (B. & C. Comp. § 788) to the effect that a condition once shown to exist continues until the contrary is proved, or until such presumption is overcome by other proof. The retracing of the will into the possession of the testatrix is not established by the opinion of this witness, as expressed, unless sustained by other circumstances and by evidence corroborating that theory.

Will Wright testifies that he does not remember the will having been deposited with him; but does remember the first

will having been taken out of his bank by Mrs. Miller. Testimony by a witness to the effect that he does not remember a certain event, notwithstanding his opinion that he thinks if it had happened he would recall it, is not entitled to great weight as a rule. For example, if A., while passing through a large crowd, observes B., speaks to him of matters in which he has a special interest, and long afterwards A. should be asked if he saw B. on that certain date, the answer would, without hesitation, most likely be in the affirmative. The testimony of A. on that point would be entitled under the circumstances to much greater weight than would that of B., who conversed not only with A., but with numerous others, and who may not happen to remember seeing A. nor recall the conversation. The reason for this is obvious. The matter discussed, while of special interest to A., was of no direct interest to B. A. was specially concerned in the topic there discussed, and directed his attention only to the one person, while B. was equally as much concerned, and conversed with numerous others, thereby forgetting A., who may distinctly remember him. Before us we have the tesitmony of the cashier of the bank saying that he has no recollection of this particular transaction. By virtue of his business, he was presumably from day to day considering many transactions in the line of his work with people of all classes and localities. Papers of various kinds were being deposited in, as well as withdrawn from, his bank, with no special reason for charging his memory with any particular one of them. When the will was left there a memorandum of Mrs. Miller's wishes was indorsed thereon, leaving no special duty on his part to be remembered. Eight years then elapsed, during which doubtless innumerable documents by different persons were left with him for safe-keeping. It is therefore not surprising that he does not recall this particular transaction. Failure to remember incidents of that kind under such circumstances are not unusual; but failure to have remembered the event on the part of Mrs. Tartar would have been an exception to the general rule. She had only her affairs, with occasionally that of some friend, as in this instance, with

which to charge her memory. Mrs. Miller looked to her as her particular assistant and friend on this occasion. She always visited and stayed with her when in Union, and had spent the winter at her home, and had frequently discussed the "will question" with her. She had seen the first will destroyed and witnessed the execution of the second, which she swears positively to having seen deposited in the First National Bank. The person who clearly remembers an event can feel morally certain of its occurrence, while the one who only fails to recall the incident cannot feel assured of its nonoccurrence. The one who sees, and remembers, knows, but the person who can only say, "I do not remember," does not know. He can only form an opinion, and say "I think" the incident did not transpire, etc., the strength of which opinion would depend, not alone on the circumstances surrounding the transaction, but, too often, upon the confidence the witness may have in his ability to remember all the dealings in which he may have taken part. It being satisfactorily established that the will was deposited in the bank, and the burden of proving its return to the possession of the testatrix being upon the contestant, it results that Mrs. Tartar's opinion on this point, that "she took the will to Clover Creek," although lightly supported by the circumstance of the failure to find the will, is insufficient, without other evidence, to establish the claim that she came into its possession after its deposit for safe-keeping, especially when considered in the light of all the circumstances shown by the record further discussed herein.

The testimony of Mrs. Tartar is harmonious on the point discussed, when taken in connection with her statements in reference thereto of three years previous in a former suit between Luis and Muhrback, involving the same property, the record of which has been introduced in evidence herein. The lapse of time between the trial of the two cases must be taken into consideration as to the memory of one of her age. When her evidence was taken in the first suit (June 19, 1903), it was much closer to the happening of the events concerning which she testified, and her statements were presumably more likely to be

accurate. However, the only material difference to be found in the entire testimony of the two cases is on this point. In the first suit, when questioned on this particular point, the witness said:

"A. I never saw Mrs. Miller from that time any more. The last time she was in our house. From the last time she was in our house she signed some papers in our house—mortgages in our house—she said she wished she had the money back on these papers. I said 'they are mortgages, and you can't get the money back until the mortgages are satisfied.'

Q. Did she say anything about the will at that time?

A. She did not. She said she didn't know what she was signing, and she was crying, and such talk as that.

Q. She was talking about the will then?

A. She didn't talk about the will, and took her valise and went up town and was gone away an hour, and when she come back she didn't talk about the will, but she watched the valise very close. She never talked about the will, but I always supposed she took it home and burned it.

Q. So the last time she was down at your house she took her valise and went up town, and when she come back she guarded that valise very carefully?

A. Very closely. Never let it out of her hand while she was in the house, and took it away with her.

Q. And it is your opinion she destroyed that also?

A. That is my opinion.

Q. At the last time she was in your house in this talk with you she regretted ever having made this will, did she?

A. No, sir; I can't, I don't know, that she said anything of that kind. She didn't mention the will. I supposed in my own mind.

(By Mr. Crawford: Your supposition is not testimony.)

A. I know it, Mr. Crawford. She didn't say anything in regard to the will.

Q. And after having that conversation with her is when she went up town under those circumstances?

A. After she and I were talking together and she said she wished she could get her money back, what she signed for before, after we had that talk, she took her valise off the table and went to town, and she was gone some time, and come back, and never let that valise out of her hand again.

Q. And that is the last time you ever saw her?     ,
A. Yes; the last time I ever saw Mrs. Miller."

In the suit under consideration it is obvious from these statements that the "trouble and dissatisfaction" referred to in her testimony arose over some mortgages she had signed in some manner, and not over the will. When asked three years later concerning this incident, with her memory probably confused for the instant, it may have occurred to the witness that the document concerning which the decedent was worrying when "crying" and "wishing she had her money back" was the will drawn, notwithstanding the will was never mentioned on that occasion. While the witness had always been a warm friend of the Miller family, at all times manifesting the kindliest feeling and interest in them, and while her testimony supports proponent's contention, it is manifest in both suits that she endeavored at all times to tell the facts as she remembered them.

3. It is firmly established everywhere that, as a general rule, when a disinterested witness, who is in no way discredited by other evidence, testifies to a fact within the knowledge of such witness, which is not in itself improbable, or in conflict with other evidence, the witness is to be believed, and the facts so given are to be taken as legally established: *Kavanaugh* v. *Wilson*, 70 N. Y. 177; *Evans* v. *George*, 80 Ill. 51; *In re John Immel's Estate*, 59 Wis. 249 (18 N. W. 182).

The testimony of Mrs. Tartar is corroborated by that of proponent and Mrs. Aughey, each of whom testify to having made their home with the testatrix since they were very young; that both Mrs. Miller and her husband had always manifested the same interest in them as if they were their own children, and always promised that their property should all descend to them at their death; that they had many times heard her explain that she had made another will after destroying the first, giving its contents, and that up to within four or five days of her death she had stated that the last will had been left with the First National Bank, and was still there, and that after she made her last statements to that effect she had no opportunity to come into

possession of the will. The interest manifested in the children
by the testatrix and her husband up to the time of the death
of each, as well as many of the circumstances tending to show
their intention regarding their property, is also testified to by
the witnesses to the first will. In considering the weight to be
given to the testimony of Mrs. Tartar, we must take into ac-
count, so far as can be ascertained, not only her opportunity to
know the facts, as well as reasons for remembering them, but
incidents connected with the lives of the parties concerning
whom she has testified, their habits, customs, affection towards
the parties interested herein, relationship and experiences to
the time of their death. In that connection the parental inter-
est manifested is unquestioned; and, in fact, it was believed by
all that the proponent was adopted by them, which impression
continued until some time after the death of Adam Miller, when,
in administering upon the estate, it was learned for the first
time that the adoption proceedings were irregular and void.
Knowing it was intended that they should inherit the property,
both remained with them, and proponent devoted many years
of his life and all his labor to the upbuilding of the farm, with
the expectation that their promises would be fulfilled.

After learning that the attempted adoption of Edward was
void, thereby precluding him from being her heir, Mrs. Miller
executed a will by which she made Edward Luis and his sister,
Clara, the beneficiaries, to share equally in all her property.
Later we find that the sister married, soon after which the testa-
trix decided to destroy the will and execute a new one, by which
she would reduce the interest to go to Clara and increase that
to be devised to her brother. This may have been on account
of being displeased with her marriage, but probably for the rea-
son that Clara, by her marriage, was provided with a home,
thereby needing less assistance, as well as for the further reason
that her brother was to remain on her farm, thereby earning
the greater interest. The new will was drawn accordingly, be-
queathing to Edward the home place of 40 acres, with all per-
sonal property and improvements, and the residue of the realty,

consisting of about 300 acres, going to him and his sister equally. The whole course and conduct of the testatrix, not only manifested a determination that the property at her death should go to them, but there is nothing in the entire record tending to show that after the second will was deposited at the bank she ever changed her mind or plans in any manner, or that the amicable relations between them underwent any modification, thereby tending to overcome the showing made by failure to find the will where deposited: *Spencer's Appeal,* 77 Conn. 638. Nor does it appear that decedent ever had any special·interest in the contestant. Although a brother, he had lived in Ohio, and, as far as appears, was unheard of in Oregon until after her death. All these salient features point to the correctness of the statements of Mrs. Tartar on the subjects involved, as well as the truthfulness of the testimony of proponent and of Mrs. Aughey, who, although interested witnesses, are entitled to belief. In fact, there is nothing to discredit their testimony, except so far as their interest may be considered.

5. Some apparent inconsistencies appear in proponent's statements in the two suits, but, when his testimony in the two proceedings are considered as a whole, it is very evident that he intended to state only the facts as he remembered and understood them. The testimony of witnesses is not to be disregarded merely because they are interested in the result. Other reasons for discrediting them must appear. As stated by Mr. Justice GRAY, in *Hull* v. *Littauer,* 162 N. Y. 572 (57 N. E. 102) : "Generally the credibility of a witness who is a party to the action, and therefore interested in its result, is for the jury; but this rule, being founded in reason, is not an absolute and inflexible one. If the evidence is possible of contradiction in the circumstances, if its truthfulness, or accuracy, is open to a reasonable doubt upon the facts of the case, and the interest of the witness furnishes a proper ground for hesitating to accept his statements, it is a necessary and just rule that the jury should pass upon it. Where, however, the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences

from the evidence, and it is not opposed to the probabilities, nor, in its nature, surprising, or suspicious, there is no reason for denying to it conclusiveness." See, also, *Second Nat. Bank* v. *Weston,* 172 N. Y. 250 (64 N. E. 949); *Daniels* v. *Foster,* 26 Wis. 686.

6. Again, when once shown that the will was duly and regularly executed, the presumption of law is strong in its favor, and its revocation must be clearly proven: *Johnston* v. *Johnston,* 1 Phillimore Rep. 447, cited with approval in *Throckmorton* v. *Holt,* 180 U. S. 584 (21 Sup. Ct. 474: 45 L. Ed. 663). The will has been traced to the bank, the officials of which have no recollection of either its receipt or withdrawal. During her lifetime no one had authority to withdraw it but the testatrix. After diligent search it could not be found. In the absence of evidence to the contrary, it might be inferred from the failure to find the instrument where deposited that it had been withdrawn by the party executing it, which fact, when once deduced, would raise a *prima facie* presumption that it was revoked. Notwithstanding the deduction possible to be made from the showing that the will could not be found, the evidence, direct and circumstantial, when considered as a whole, is ample to overcome any inference possible to be drawn therefrom.

7. There being no presumption arising from this showing alone, but merely the possibility of an inference, the facts from which, when once inferred, might raise a presumption, and the onus being on those who assert the revocation, the question arises: Can the declarations made by decedent subsequent to the execution of her last will, not only showing it to have been deposited, as claimed, but that it was still there to within a few days of her death, and declarations tending to show her affection toward the devisees, with no change in her feelings toward them, thereby indicating the improbability of desiring to revoke the instrument, when corroborated by direct evidence that after the making of the declarations she had no opportunity to withdraw the will from the bank, or otherwise come into possession of it, be admitted for the purpose of having the court infer that the

will had not been returned to her possession nor revoked? The authorities on this subject are far from being uniform. Among those holding declarations of this kind inadmissible are *Leslie v. McMurtry*, 60 Ark. 301 (30 S. W. 33); *Walton v. Kendrick*, 122 Mo. 504 (27 S. W. 872: 25 L. R. A. 701); *In re Burbank*, 104 App. Div. 312 (93 N. Y. Supp. 866); *In re Kennedy's Will*, 167 N. Y. 163 (60 N. E. 442); *Gordon's Case*, 50 N. J. Eq. 397 (26 Atl. 268). This question does not appear ever to have been directly before this court, but in the case of *Young v. State*, 36 Or. 417 (59 Pac. 812: 47 L. R. A. 548), it is held that declarations of a decedent are admissible to identify the deceased by showing his conversation upon the subject and the account he gave of himself during his lifetime. The same reasons which would admit declarations for the purpose of identifying the decedent, thereby enabling an heir to succeed to property, should make declarations admissible for the purpose of showing the existence of a will and that it had not been destroyed or revoked. The continuing validity of a will always depends upon the intention of the testator that the instrument purporting to be his last will and testament shall be and continue to be such. Then, why should not only his acts, but his declarations as well, be admissible, both as to the disposition of the property and the intention existing within any reasonable time before death, and after the execution of the will, as well as before? The early English cases held declarations made after the execution of the will inadmissible: *Wharram v. Wharram*, 3 S. W. & T. R. 301: 32 L. J. (P. M. & A.) 75; *Quick v. Quick*, 3 S. W. & T. R. 442: 33 L. J. (P. M. & A.) 146. But in 1876 these decisions were overruled in what is recognized as a leading case: *Sugden v. St. Leonards*, L. R. 1 P. D. 154. In this case, as in many decisions on the subject in this country, a dissenting opinion appears. In giving his reasons therefor, MELLISH, L. J., said: "I am not myself prepared to say that the decision in *Quick v. Quick* is bad law. If I was asked what I think it would be desirable should be evidence, I have not the least hesitation in saying that I think it would be a highly desirable improvement

in the law if the rule was that all statements made by persons who are dead respecting matters of which they had a personal knowledge, and made *ante litem motam,* should be admissible. There is no doubt that by rejecting such evidence we do reject a most valuable source of evidence. But the difficulty I feel is this: That I cannot satisfactorily to my own mind find any distinction between the statement of a testator as to the contents of his will, and any other statement of a deceased person as to any fact peculiarly within his knowledge, which, beyond all question, as the law now stands, we are not as a general rule entitled to receive."

It is also suggested in some opinions in support of that view that there is no more reason for admitting evidence of this nature in reference to wills than in the case of deeds; but this position overlooks the distinction between a will and a deed, and the difference between the results which might often follow, if received in both instances, or rejected in both, as the case may be. By the execution of a deed title passes to the grantee; but in the making of a will nothing passes at the time, the status of the property remains unchanged, its execution in no way encumbers the title; it may be conveyed or mortgaged as before, and to the time of the death of its owner the property remains subject to any disposition desired. Any declarations, therefore, which the testator may make after the date of the will cannot affect vested rights; but with a deed, when executed, the title has departed, and to admit the grantor's declarations after its delivery might impair, not the grantor's rights, but the vested rights of an innocent purchaser. In one case the declarations would impair vested rights, while in the other it would only affect the rights of those claiming an inheritance through the person making the declarations. The declarations after the will would follow the title and affect the interests of persons claiming title by reason of his death, but in no sense could they be affected as innocent purchasers for value. Nor can they have any rights in or to the property at all, if the devisor sees proper to declare otherwise, and if, by making a will, he can change the beneficiaries

at any time from his legal heirs to persons who would not other-wise inherit his estate, it is but reasonable and just that any declarations made within a reasonable time prior to his death, in reference to his wishes and intention, should be permitted to follow, and be admissible for the purpose of determining whether such will had in fact been executed; whether revoked, if made; and, if accompanied by any corroborating circumstances, to determine its contents, if lost. It is true that as a general rule the declarations of a deceased person, whether in writing or oral, are inadmissible. "But," says MELLISH, L. J., in *Sugden* v. *St. Leonards:* "So inconvenient was the law upon this subject, so frequently has it shut out the only available evidence, so frequently would it have caused a most crying and intolerable injustice that a large number of exceptions have been made to the general rule." In discussing the same point in that case, COCKBURN, C. J., observes: "The declarations of deceased persons are in several instances admitted as exceptions to the general rule—where such persons have had peculiar means of knowledge, and may be supposed to have been without motive to speak otherwise than according to the truth. It is obvious that a man who has made his will stands pre-eminently in that position. He must be taken to know the contents of the instrument he has executed. If he speaks of its provisions, he can have no motive for misrepresenting them, except in the rare instances in which a testator may have the intention of misleading by his statements respecting his will. Generally speaking, statements of this kind are honestly made, and this class of evidence may be put on the same footing with the declarations of members of a family in matters of pedigree, evidence not always to be relied on, yet sufficiently so to make it worth admitting, leaving its effect to be judged of by those who have to decide the case."

In *Burge* v. *Hamilton*, 72 Ga. 625, the court, speaking through Mr. Chief Justice JACKSON, said: "And after reviewing other English and many American decisions of eminent judges in this country, our own first Chief Justice thus announces the con-

clusions of his own mind: 'Having thus, as briefly as I could, adverted to the conflicting decisions upon this vexed question, James Kent and Joseph Story, men unsurpassed for legal learning, being arrayed against Ambrose Spencer and Thomas Ruffin, to say nothing of Spencer Roane, than whom abler common-law judges never presided in the courts of this country, and differing as I do from a worthy brother and associate, for whom and for whose opinions I have the highest respect, I must say that I have not a scintilla of doubt resting in my mind that the testimony excluded should have been received by the circuit court.' " An examination of most of the cases holding declarations of this class inadmissible discloses that the conclusions there reached are largely due, whether consciously or not, to the fear that such declarations, even when conclusively shown to have been made, are unreliable. This fear is not without some foundation. But while the statements of a declarant may sometimes be false, and intentionally so, or when true may have been misunderstood, or may be inaccurately remembered, or misquoted from design, this can go only to the degree of credit to be given the testimony and not to its admissibility. Because evidence should be weighed with care is not sufficient alone to justify its exclusion. The possible evils which might result from the exclusion of this class of testimony are far more to be feared than are those which might accrue from the possibility of declarations admitted being untrue, misquoted, or otherwise inaccurately given: *Collagan* v. *Burns,* 57 Me. 449.

After a careful consideration of the subject, we are of the opinion that the great weight of authorities from the time of the decision in the *Sugden-St. Leonards Case* down to the present, as well as the better reasoning, sustain the admission of the declarations of a decedent made after the execution of a will as well as before, if made within a reasonable time prior to his death, and warrant us in holding such declarations admissible under the circumstances in the case before us. Among authorities supporting the rule here recognized are Thornton, Lost Wills, § 64; 23 Am. & Eng. Enc. Law (2 ed.), 149; *Sugden* v.

*St. Leonards,* L. R. 1 P. D. 154; *In re Spencer's Appeal,* 77
Conn. 638 (60 Atl. 289); *Ewing* v. *McIntyre,* 141 Mich. 506
(104 N. W. 787); *McDonald* v. *McDonald,* 142 Ind. 55 (41 N. E.
336); *In re Page's Will,* 118 Ill. 576 (8 N. E. 852: 59 Am. Rep.
395); *In re Marsh's Will,* 45 Hun, 107; *Gavitt* v. *Moulton,*
119 Wis. 35 (96 N. W. 395); *In re Donnelly's Estate,* 190 Pa.
417 (42 Atl. 882: 70 Am. St. Rep. 637); *Clark* v. *Turner,*
50 Neb. 290 (69 N. W. 843: 38 L. R. A. 433); *Williams* v.
*Miles,* 68 Neb. 463 (94 N. W. 705, 96 N. W. 151: 62 L. R. A.
383: 110 Am. St. Rep. 431); *In re Harris' Estate,* 10 Wash. 555
(39 Pac. 148); *Pickens* v. *Davis,* 134 Mass. 252 (45 Am. Rep.
322); *Lane* v. *Moore,* 151 Mass. 87 (23 N. E. 828: 21 Am. St.
Rep. 430); *Davis* v. *Elliott,* 55 N. J. Eq. 473 (36 Atl. 1092);
*Hoppe* v. *Byers,* 60 Md. 381; *Burge* v. *Hamilton,* 72 Ga. 568.

The declarations of the testatrix having been properly ad-
mitted, they, together with the circumstances shown in connec-
tion therewith, so fully sustain the direct and positive testimony
before us that we are satisfied the second will made was regularly
executed and never revoked. The conclusion reached by the
circuit court being in full accord with the facts as they appear
from the record, the decree of the circuit court should be
affirmed.　　　　　　　　　　　　　　　　　　　　　　　AFFIRMED.

Mr. Justice EAKIN, having tried the cause in the court below,
did not sit in this case.

---

<div align="center">

Decided 25 June, 1907.