BELLE WILLIAMS, ADMINISTRATRIX, ET AL., APPELLANTS,
v. JOSEPH H. MILES ET AL., APPELLEES.

FILED SEPTEMBER 26, 1910. No. 15,547.

1. **Appeal: REMAND: LAW OF CASE.** "The language used in the former opinions of this court, commenting upon the evidence of the various witnesses, was used with reference to the questions presented in this court only, and was not a discussion of the weight that should be given to this evidence upon a new trial of this case. The court will apply the law of the case so far as it has been determined by this court, but the discussion of the evidence here will not restrict the trial court in its examination and submission of the questions of fact." *Williams v. Miles,* 73 Neb. 205.

2. **Wills: REVOCATION: SUBSEQUENT WILL: EVIDENCE.** The fact, if established by competent proof, that a subsequent will was made is not sufficient of itself, and without some proof of its actual contents, to show the revocation of a former will (*Williams v. Miles,* 68 Neb. 463), nor would the proof of such fact alone be sufficient to justify the setting aside of the due probate of a former will, the alleged subsequent will not being found or produced, nor a verified copy thereof presented.

3. **——: EXECUTION: EVIDENCE.** An attorney testified that he prepared a will consisting of two sheets and four pages to be executed by the proposed testator; that the instrument was signed by the testator and witnessed in his presence. In his testimony he detailed the facts and circumstances attending its execution, including remarks made by himself, the testator and the wit-

(455)

nesses, but did not know the witnesses and failed to remember their names. Two witnesses testified that they witnessed the signature of an alleged will of the same person at the place and about the time stated by the attorney; that the person signing as testator said it was his will, but they were not informed of its contents, did not read any part of it, and did not know what the paper contained; that it consisted of many sheets forming a body of paper near half an inch in thickness; that there was but one other person, aside from the alleged testator and the witnesses, in the room, and that person was wholly unknown to one of the witnesses, the other witness testifying to a total want of recollection as to who the other person was, or whether he knew him, neither one being introduced to him, and both agreeing that he did not utter a word at or before the signing or while they were in the room. *Held*, That these facts failed to show that the paper there signed, if so signed, was the one said to have been written by the attorney, and that there was insufficient proof of the contents of the alleged will, or that the paper witnessed by the two persons signing as witnesses was the instrument claimed to have been prepared by the attorney, or was a will.

4. ———: Revocation: Subsequent Will: Evidence. The proof of the execution and contents of a lost will should be clear and convincing, and the declaration of the testator alone that an instrument he is signing is his will, but without any evidence as to its contents, will not be held sufficient to revoke a former will proved to have been made and duly admitted to probate, there being no proof that the alleged lost will was ever seen after its supposed execution.

5. ———: Execution: Evidence. The evidence as to the execution of any will by the deceased, at the place and on the date named, is examined and set out in the opinion, and the same is *held* insufficient to establish the fact.

Appeal from the district court for Richardson county: John B. Raper, Judge. *Affirmed.*

*John L. Webster, John H. Atwood, Reavis & Reavis, I. J. Ringolsky, Frank M. Hall* and *J. H. Broady,* for appellants.

*T. J. Mahoney, J. A. C. Kennedy, Clarence Gillespie* and *E. Falloon, contra.*

REESE, C. J.

Stephen B. Miles, a resident and having his domicile in Richardson county, in this state, executed and declared a certain written instrument as his will, at Rulo, in said county, on the 27th day of November, 1888. On the 11th day of April, 1889, at the same place, he executed a codicil by which he changed one item in the will. Both the will and codicil were duly witnessed and executed in accordance with all the requirements of law, the two constituting his will. He retained his residence and home in said county until the 30th day of October, 1898, when he died at Falls City. The will made at Rulo will hereafter be referred to as the Rulo will. It was presented to the county court of Richardson county for probate, and, after proper proceedings being had, was admitted to probate on the 2d day of December, 1898, without objection or contest, and no appeal was taken from the decree. On the 29th day of March, 1899, a petition was filed in the county court by the plaintiffs herein, in which the relationship of the plaintiffs to deceased was set out and the probate of the Rulo will was averred. It was then stated, in substance, that the probated will was not the last will and testament of the said Stephen B. Miles, deceased, which fact was alleged to be well known to the proponent thereof at and before the time he caused and procured it to be admitted to probate; that his actions in that behalf were fraudulent; that a later will had been duly made and executed by the testator, by which the Rulo will had been revoked, all of which was alleged to be well known to him at the time, but was unknown to plaintiffs until long after the decree probating the Rulo will had been entered; that about the 1st day of April, 1897, the said Stephen B. Miles duly made another and later will at the city of St. Louis, Missouri, by which he had changed the disposition of his estate from that made in the Rulo will, and had by his said later will fully revoked and canceled said will and all others by him before that time made, and

that no other or later will had been since made; that the estate of the said Stephen B. Miles was of the value of about $1,600,000, the real estate thereof being worth about $1,000,000, and the personal property, consisting of stocks, bonds and other choses in action, worth the sum of $600,000; that the defendant Joseph H. Miles, upon the probating of the Rulo will, became the executor and possessed of all the books and papers of the deceased, and it is averred upon information and belief that among said papers was the later will made in St. Louis, which he had secreted and suppressed with the purpose and intent of defrauding plaintiffs. The petition is of considerable length, but it is not deemed necessary to state the averments with any greater particularity. The prayer is that the previous order of the court admitting the Rulo will to probate be set aside and that plaintiffs be permitted to present the will of about April 1, 1897, for probate.

An answer was filed by the defendants Joseph H. Miles, John J. Williams, John W. Holt, Nora Harrison, John I. Dressler and J. K. Biles, by which the death of Stephen B. Miles and the execution and probate of the Rulo will were admitted, as also was the extent and value of his estate at the time of his death. All averments of the petition as to the making of the will at St. Louis (which for convenience will be hereafter referred to as the St Louis will) or any will subsequent to the making of the Rulo will were denied: It was alleged in substance that full, due and legal notice was given of the presentation of the Rulo will for probate; that the county court had full jurisdiction of the subject matter of the parties; and that said decree was a final adjudication of the whole matter. All averments of the petition not admitted were denied.

The defendant Samuel A. Miles filed an answer and cross-petition, in which, after the denial of certain averments of the petition reflecting upon himself, he practically realleged those of that pleading and joined in the prayer for a new trial, the cancelation of the decree ad-

mitting the Rulo will to probate and that the alleged St. Louis will be probated. The pleadings are voluminous, but it is believed that the foregoing statement of their contents will be sufficient.

Upon a trial in the county court, the prayer of the petition of plaintiffs and the cross-petition of Samuel A. Miles were denied and the action dismissed, thus leaving the decree probating the Rulo will unimpaired. The cause was then appealed to the district court, where the pleadings were to some extent amended, but in view of the questions here presented it is not necessary to refer to them further. Pending the proceedings in the district court the cause has been appealed to this court a number of times, and the history of such proceedings may be found in 62 Neb. 566; 63 Neb. 851, 859; 68 Neb. 463, 479; 73 Neb. 193, 205, 206. The cause has been finally tried to the district court for Richardson county, the trial resulting in a finding and decree in favor of defendants and dismissing plaintiffs' petition and cross-petition of Samuel A. Miles. Plaintiffs and cross-petitioner appeal. On this appeal we are confronted with a bill of exceptions of about 3,000 pages and a transcript of 275 pages, as well as elaborate briefs of over 800 pages. In view of the condition of a part of the bill of exceptions it would be practically impossible to understand and comprehend the evidence, were it not for the care and labor bestowed upon the briefs, and the very able arguments presented by counsel.

A motion to suppress the bill of exceptions is filed by defendants. On the trial of the case some 600 pages of the evidence offered and received by the court, the greater part of which was introduced to prove certain alleged corrupt practices by an attorney residing in another state, but representing plaintiffs, was discarded by the court and stricken out at the time of entering the decree in favor of defendants. This evidence, however, had all been introduced. The bill of exceptions was prepared and submitted by plaintiffs without including that evi-

dence. The bill as presented consisted of 5 volumes of from 500 to 800 pages each. Defendants and cross-petitioner Samuel A. Miles objected to the approval of the bill by the trial judge, when the cross-petitioner prepared and submitted the 6th volume, containing, as claimed, all of the discarded evidence, but the preparation and submission of that volume was delayed for some time after the settling of the other 5 volumes. It is claimed by counsel for defendants that a large portion of the evidence contained in the 6th volume at the time it was served upon them has been removed therefrom. This is perhaps true, but we think from the record made that the portion referred to was removed by the judge for the reason that it was contained in the 5 volumes before that time settled. It is also claimed by defendants that important documents and other evidence submitted on the trial are not included in any of the volumes. The certificates of the judge render it reasonably certain that he understood that all the evidence was included in the bills as finally allowed and signed. If this be correct, the evidence will be retained notwithstanding the irregularity of the settling of the bill. The motion to suppress is overruled.

The legal propositions involved in the case in the different phases through which it has passed have been substantially all settled by the former decisions of this court, above referred to, and the principal question now involved is one of fact, and that is: "Was a will executed at St. Louis in 1897 by Stephen B. Miles, deceased?" If such a will was prepared, executed and witnessed, as claimed by plaintiffs, containing a revocatory clause, it will have to be conceded that the Rulo will was thereby revoked and rendered null and void, and the decree admitting it to probate would have to be set aside and the new trial granted as prayed for by plaintiffs. The finding of the district court was "that Samuel A. Miles and the plaintiffs are not entitled to have the probate of the 1888 will set aside," and "that Stephen B. Miles did not execute a will in St. Louis in 1897, as alleged in plaintiffs' petition, and

that the will known in the records as the 'Rulo will' is the last will and testament of Stephen B. Miles, deceased." Upon these findings plaintiffs' suit was dismissed. There is no proof in the record that the will alleged to have been made in St. Louis has ever been seen since its alleged execution, and therefore neither the will nor a verified copy of it was introduced in evidence. It is not contended that there was sufficient proof of the whole contents of the will, as to the distribution of the property of the deceased, to entitle it to probate as to the legacies or devises, but practically the whole contention is that a will was duly made and executed and that it contained a clause revoking former wills and testaments, the effect of which, if established, would be to destroy the Rulo will, leaving the property of the deceased intestate and subject to distribution under the law of descent, which, as conditions now are, would probably be more equitable than as provided in that will. However, we are forbidden to enter that field, and, as above indicated, confine ourselves to the one question decided by the district court, to wit, considering the whole evidence, is it sufficiently proved that the deceased executed a will in St. Louis, Missouri, about the 1st of April, 1897? The evidence taken upon that part of the case tending to prove and to disprove such execution is quite voluminous, and it is claimed by each side that the evidence preponderates in its favor. The burden of proof being upon plaintiffs, it follows that it is not enough that the evidence produced by plaintiffs renders it probable that Mr. Miles made some kind of a will at St. Louis, but such fact must be shown by a preponderance of the evidence or plaintiffs must fail. In disposing of the case we will confine our investigations to the one question.

Preliminary to this, however, it might be well to inquire how far the former expressions of this court while considering the evidence in the case then before it should be considered as bearing upon the finding of the district court upon the trial from which this appeal is taken, or

upon the holding here on appeal.  There are a number of expressions indicating a conviction upon the minds of the judges in writing the opinions that the proofs then before the court offered by appellants showed, or tended to show, that a will was in fact made in St. Louis.  What effect should such expressions have upon the judgment of the district court when subsequently hearing the trial of the case, and to what extent, if at all, are they binding upon us in considering this appeal?  In other words, do they become the law of the case from which no departure should be made?  In the opinion in 68 Neb. 463, at page 475, it is said: "Without going over the details, we may say that the evidence produces a strong conviction that a will of some sort was made at St. Louis.  There is not only the testimony of the two subscribing witnesses, but a very considerable mass of circumstantial evidence.  Moreover, the declarations of the testator are well authenticated and circumstantial.  Taking all these matters into account, and bearing in mind the apparent injustice of the disposition made in the instrument admitted to probate, the suspicious character of many things connected with the finding of the Rulo will, and the disposition of the testator to make wills, as shown in evidence, if the question were merely whether a subsequent will was executed, we should hesitate to say that the decree could stand."  In the opinion written by Judge SEDGWICK, 73 Neb. 193, the judge, after quite an extensive review of the evidence then before the court upon the subject of the execution of the St. Louis will, says: "Upon the hearing of this application for a new trial the district court found that 'there was a will made by Stephen B. Miles, deceased, in 1897, at St. Louis.'  The witness Paul T. Gadsen (Gadsden) positively testifies to this fact.  He also states quite definitely the contents of the will.  The character of this witness and the reliance to be placed upon his testimony will be again referred to.  It is sufficient now to say that we consider the whole evidence amply supports this finding of the trial court."  Again, in writing an opinion upon a motion to

modify the former opinion, the judge says (73 Neb. 206) : "What was meant was that, if the evidence introduced before the district court upon the new trial which has been ordered should be the same as it now is in this court, it would be sufficient to require the district court to reverse the order of the county court in refusing to set aside the probate of the Rulo will." There are other expressions in the line of decisions in this case, equally strong and definite, perhaps, bearing upon the evidence, but which need not be here noticed, as the above will be sufficient to attract attention to the proposition involved. In the opinion first written (73 Neb. 193) Judge SEDGWICK, at page 196, says: "If a decision of this court should ever become the law of the case, it should be upon a question of practice (then under discussion), when the parties to the litigation have acted upon that decision and guided their practice by it;" thus holding, in effect, that as a declaration of the law applicable to a question presented, and on which the parties have acted during the subsequent stages of the litigation, it should not be departed from. But, as said in the *per curiam* opinion (73 Neb. 205) at page 206: "The language used in the former opinions of this court, commenting upon the evidence of the various witnesses, was used with reference to the questions presented in this court only, and was not a discussion of the weight that should be given to this evidence upon a new trial of this case. The court will apply the law of the case so far as it has been determined by this court, but the discussion of the evidence here will not restrict the trial court in its examination and submission of the questions of fact."

This holding, in the opinion of the writer, is in harmony with the well-settled law upon the subject, and left the district court, as well as this court upon subsequent appeals, to pass upon the weight of the evidence, unaffected and untrammeled by the expressions of this court upon former hearings. In *Koyer v. Willmon*, 106 Pac. (Cal.) 599, it is said, quoting from *Allen v. Bryant*, 155 Cal. 256:

"When the fact which is to be decided depends upon the credit to be given to the witnesses whose testimony is received, or the weight to which their testimony is entitled, or the inferences of fact that are to be drawn from the evidence, the sufficiency of the evidence to justify the decision must be determined by the tribunal before which it is presented, and is not controlled by an opinion of the appellate court that similar evidence at a former trial of the cause was insufficient to justify a similar decision." Without referring at length to the decisions of other courts upon this subject, the writer concludes that the whole subject of the execution of the St. Louis will was for the decision of the district court upon the final trial and submission of the case upon the evidence, untrammeled and unconstrained by anything we may have said upon the evidence before us at the time the decisions were made. The same is true as to its application to the hearing now before us. These views are not fully concurred in by a majority of the court.

However, it is proper to say here, without going into details, that additional evidence was presented upon the last trial, which, if believed to be true, might, and probably would, lead this court now to revise its opinion. It is said, in substance, that this new evidence is the result of the labors of detectives sent out to *find* the needed testimony, and does not carry with it the conviction of its truth which might otherwise obtain. It often happens that detectives, like other people, are unscrupulous and corrupt; that when sent out upon a mission they will resort to almost all kinds of corruption in order to meet the requirements imposed, and the results of their efforts should be looked upon with suspicion. From observations of the method adopted by that class, the writer hereof is in sympathy with the contentions of plaintiffs, and yet this does not of necessity carry with it the conviction that the testimony of apparently disinterested witnesses, even if *found* by a detective, is untrue and not entitled to credit. They may be truthful and their testimony be en-

titled to credence, while if the same facts were testified
to by the detective who it is said made the "discovery" of
the witness, such testimony might and probably would not
carry the same weight. As we have said, the claim is that
a will was made in St. Louis long after the Rulo will was
executed. As to the execution and admission to probate
of the Rulo will there is no dispute. The deceased resided
in this state. The parties to this action resided here. The
St. Louis will, if made, was written by a stranger to the
deceased and all the parties to the suit. It was said to
have been witnessed by persons unknown to many, if not
all, of the litigants. So far as the evidence shows, no will
nor a copy of it has been found. In view of these facts,
it is not surprising that both sides of this controversy
found it necessary to resort to the labors of detectives in
making needed investigations, as both did. While there
is much in the briefs and arguments in the way of crim-
ination and recrimination concerning this feature of the
case, we do not find it necessary to engage in a discussion
of the subject of the methods employed, nor to cast any
reflections upon either party. It may be that each felt
justified in pursuing the course adopted.

This brings us to the one controlling question in the
case: Does the evidence preponderate in favor of the con-
tention that a will was made in St. Louis? If not, the
decision of the district court finding that no such will
was made will have to stand. If the affirmative of the
question is shown by the necessary evidence, a reversal of
the decree must follow, and the new trial sought be
granted. To the mind of the writer, the question is
shrouded in considerable mystery. The testator resided in
Richardson county in this state. He had been a citizen
of Richardson county for many years, he having been one
of the early pioneers of that county. He had amassed an
immense fortune, much of which was in that county. He
had employed an attorney in Falls City who had become
familiar with his affairs and in whom he had confidence.
His time was mostly spent upon his farm, or ranch, in that

county, until the later years of his life. He had interests
in the state of Maryland, his former home, and was there
more or less frequently, and spent a good portion of the
winter months of his later life in the St. James hotel in
St. Louis, Missouri. He had a number of acquaintances
there, among men of high standing in commercial pur-
suits and at the bar. He was well acquainted with the
proprietor of the hotel and the hotel clerk, but he does not
seem to have made them his special confidants in his gen-
eral business affairs. They testified that he informed
them that he contemplated or desired to make a will; that
he was not satisfied with the disposition of his property
made by a former will; that about the last day of March
or the first day of April, 1897, they were sent for to go to
his room, and when they were there he asked them to
witness what he said was his will, and produced a paper
or instrument consisting of a number of sheets which he
signed, saying it was his will, and asked them to sign as
witnesses, which they did, but neither knew its contents,
nor if it was a will, except as so stated by him. They say
a stranger, with whom they were unacquainted, was in the
room, but to whom they were not introduced and whom
they have never since met. It is asserted that the St. Louis
will was written by Paul T. Gadsden, a young man, an
attorney, then residing in St. Louis, with little if any
practice in the courts, but little known in St. Louis and
wholly unknown to deceased. Mr. Gadsden testifies that
he wrote a will about the time named for a person claim-
ing to be Stephen B. Miles of Falls City, Nebraska, and
which was signed and witnessed at the St. James hotel.
While we are not inclined to indulge in any unnecessary
criticism of Mr. Gadsden, we are persuaded that, to say
the least, he may have been mistaken as to the identity of
the testator, if any will were written by him. The history
of the alleged execution of the instrument is quite com-
plex, and there are many circumstances shown which,
upon an analysis of the testimony of those connected with
the affair, present serious doubts. The life history of

Gadsden .leads one to believe that at the time named he was quite unstable as to his purposes, not remaining long in one place, and when finally located he was in the Republic of Mexico, and, upon request and the advancement of sufficient funds, came to St. Louis and asserted the writing of the will. Our attention is attracted to the circumstances surrounding the preparation and execution of the alleged will. The fact of the existence of Mr. Gadsden was wholly unknown to Mr. Miles. It appears that at the time of the writing of the alleged will Mr. Gadsden and a Mr. Blow had their offices in a suite of rooms on the eighth floor of the Security building, in St. Louis, in connection with another attorney by the name of Wind; that a Mrs. Wilson was employed by Gadsden & Blow as their stenographer and typist, and that she acted in the same capacity for Mr. Wind. Her testimony was taken by deposition. She testifies that she was in that office in 1897, and that while she was there, in the latter part of the winter or early spring, a gentleman, a Jew, having an office on the same floor and near by, but whose name she does not know, came into the office accompanied by a young man and an old gentleman, whose names she does not know, asked for Mr. Gadsden, and introduced the old gentleman to him. She described the old gentleman referred to as "a very small old gentleman," and stated that he and Mr. Gadsden sat down and talked from 20 minutes to half an hour, and then they stepped into an adjoining room for a short time, when they returned, and the old gentleman and the young man left. In her further description of the old gentleman she says: "I couldn't understand anything he said because, I don't know, there was something the matter with him. I don't know what it was—his voice or something." Her attention being again called to the subject in her examination in chief, with the request that she describe him more particularly, she said: "Why, he was quite old, and I don't know—I don't know what was the matter, his voice must have gone, he talked something like, I don't know whether

—he had shortness of breath, or something, I don't know what it was; I couldn't tell, something the matter—he talked kind of in a peculiar tone, he didn't have much to say anyway, just sat there for a few minutes, he sat in Mr. Blow's chair and had his back turned toward me, and Mr. Gadsden was sitting here (indicating) and they were talking to him, and then they got up and went in the other room." On cross-examination she stated that he was not sitting with his "whole back" toward her, but partially so; that she could not see his features distinctly because he was "muffled up." "He was bent, I don't know what was the matter with him, he was kind of stoop-shouldered. * * * He talked kind of husky, or like he was short breathed, or something, I don't know what was the matter with him. I remember him well because I thought he was so awfully old to be out in such weather. * * * He didn't have very much to say, the other man did most of the talking"; that while there they talked about making a will, or see about a will, or something to that effect; that she never saw him after that; that some days after that the young man came in early in the morning, and inquired for Mr. Gadsden who had gone out. He left word for Mr. Gadsden to come to a hotel, she understood the Southern, and went away. She informed Mr. Gadsden, but directed him to the Southern, whither he went, but returned saying they were not there. On the same day the young man came again and left a card, saying he would return for Mr. Gadsden. She went to lunch, and supposed they met and went away together. Mr. Gadsden returned and directed her to take the dictation of a will from notes and memoranda which he held. She took his dictation of the will in full in shorthand, subdivided into paragraphs, and wrote it out at length with the typewriter, at the same time making a carbon copy; that the whole was written on two sheets of typewriting paper. She was asked: "And at that time there had been no will made?" Her answer was: "No, sir; I am positive of that." She further stated that when she had prepared the

copies Gadsden "seemed to be in a rush and left the office immediately and went over there (to the hotel)"; that he told her "he was going over to have the copy signed"; that he returned in a short time and narrated the circumstances of the execution of the will, the sickness of the testator, "the surroundings being so peculiar, something about the bed, I don't know what it was, whether sheets or what it was, but he went on talking about it, but I didn't pay much attention to it, but I imagine that he had sheets around the bed, but I did not ask."

The testimony of Gadsden was also taken by deposition. This deposition was taken in January, 1902, and according to his answer he was 31 years of age the previous June, and at the time of the alleged execution of the will on the last day of March or the first day of April, 1897, he was less than 26 years of age, and had been admitted to practice at the bar of St. Louis two years before. For the purpose of a comparison with the testimony of plaintiffs' other witnesses it will be necessary to observe his testimony with some care. He testifies that he was sitting in his office one morning with his stenographer, Mrs. Wilson, when two gentlemen came in accompanied by a third one; that said third party, who occupied a nearby office and was known to him by sight, but he could not give his name, said: " 'You young men are lawyers in here?' I said, 'Yes,' and he said, 'Here are some gentlemen looking for a lawyer,' " and left the room; that the older man of the other two said his name was Stephen B. Miles from Falls City, Nebraska, and proceeded to give a list of his property and heirs, as the witness says he remembers it; that after referring to a ranch and other large tracts of land the witness asked him about how many acres of land he had, and he said some 20,000 acres; that he mentioned a long list of other property, a small tract of land near Falls City, a farm of some 300 acres, another small farm by name, stocks, bonds, bank stocks, notes, liens, mortgages and other evidences of indebtedness. The witness continued: "And when he got through with that I looked up to see if anything was the

matter with him. To me, he appeared a comparatively poor
man. I thought he was off his head, or was trying to 'stuff
me,' as they sometimes say, and I looked at him, for it in-
cluded nearly every kind of property that I had heard of.
\* \* \* He then said city lots in St. Louis, Missouri. He
then said other farm lands, and after that he commenced
to tell me how he wanted to leave his property." The wit-
ness gives the names of persons to whom he says Miles
desired the property to be devised and bequeathed, the
witness naming Miles' grandchildren by his daughters, one
of whom was not his grandchild, and the witness also gives
the names of a number of other persons to be remembered
in the will. The witness further testifies that he asked
Miles if he had any special instructions as to whom he
wanted property left in addition to those named by the
witness, when Miles said he wanted to do the fair thing by
all his children, that he was getting old, was preparing to
leave this world, and he thought no animosities should be
left behind; that the witness told him he thought he was
right, spoke to him of his own father's will from which
some friction arose, and that he thought a will ought, as
near as possible, to follow the law of descent; that Miles
said when he died he wanted every one who thought they
had the right to expect anything of him to feel that he had
remembered them; that Miles asked him if it was necessary
to include a revoking clause, and was informed that such
would not be necessary; that Miles said he had written
other wills, and was informed by the witness that the
safest way was to destroy all previous wills, and Miles
said he did not think he knew where a former will was;
that Miles and the young man left the office, the witness
having made a penciled memorandum of the substance of
what disposition was to be made of the property. When
asked how long those people were in his office during that
conversation, his answer was: "Not more than 25 minutes
I should judge at the most." The witness further states
that perhaps the next afternoon Mr. Miles came to his
office alone and countermanded much of what he directed

the day before as to the disposition of his property; that instead of giving his sister Amanda all his cash in bank he desired that she have one-half, and the other half to be equally divided between his children and their representatives; that all his bonds were to be given to his two sons Samuel and Joseph; that one-half of his bank stocks were to be given to his two sons, and the whole of the remainder of his estate to be equally divided into four equal parts and apportioned among the four children or their representatives. As the witness expressed it, "The entire balance of the estate to be divided in the same way," one-fourth part to each of the four children or their heirs.

It would perhaps be proper to digress for a moment at this point. We have searched the record in vain for any later instructions as to what the contents of the alleged will should be. About 100 pages further on in the examination of the witness he is asked to give the contents of the will as executed, and he puts it: That of the other lands of the testator the will gave "his friend Frank Marvin such one of his farms, was the statement, not exceeding 300 acres in extent, as he might elect to choose. To his namesake, Miles somebody—that name I don't remember—he devised another farm, simply describing it as 'my *blank* place,' and adding some phrase, where he now lives with his parents, or some such descriptive phrase." If the witness is telling the truth, or rather if the final instructions were as he gives them, it is clear that those instructions were violated by him, and, according to his own theory of the facts, the will he says Mr. Miles signed was not his will, and Mr. Miles knew nothing of the contents of the paper it is claimed he signed. The witness details trips to the Southern hotel; his finding a card upon his table; his going to the St. James hotel, taking a pen or pencil "rough copy" of the will he had prepared; his being escorted to the room occupied by Mr. Miles, where he found him lying on a bed, "around that bed was some kind of curtains, or a sheet or mosquito net, or something surrounding it almost entirely"; his finding another gen-

tleman in the room, and, "as I came in, this man said, 'Have you got Mr. Miles' will?'" The witness says he answered: "'Yes, but it is not in shape to be signed this morning. Is it necessary?' And he said, 'Yes, Colonel Miles wanted to sign it today,' and I said, 'Yes, it may be done, if one of you gentlemen will write it out here I will dictate it to you from the draft I have got of it.' He said he didn't have any paper, so they sent out and got some. Perhaps one of the gentlemen got it. * * * I then dictated the will to one of the gentlemen present from my original draft, and he took it down in pen, writing it, commencing with a margin, and writing it in paragraphs down this sheet, down the reverse, as I remember, across this, across this, and part of the way at least, if not all through it, into another sheet (that you call four pages). I remember that during the writing of it the man who was writing it didn't say a word. I simply dictated it to him and he put it down. When it was finished I exchanged papers with him and reread it, and found it as correct according to my original draft, and that it was in condition to be signed, and I then said, 'Will you gentlemen witness it.' And they said, 'Oh, we rather not, suppose you get some one else as one of us has written it.' One of them said, go down and get so and so, and so and so, and one of them left the room, and I think both of them went out shortly. After one went out the other did. Then came in a man who was a stranger to me. He was there for a few minutes and waited, and I spoke to him, and he spoke to Colonel Miles, who was on the bed at that time. I said, 'Where is the other gentlemen who is going to witness the will?' He then either went out or sent for him. Shortly afterward another of them came in. To neither of these gentlemen was I introduced. I don't think when either came in was any one else there. No one but myself and Mr. Miles. Before the second one came into the room the first one and myself helped the colonel to a little table that was in the room to sign the will. When the second one came in I said,

'Gentlemen, this is a will that Mr. Miles is making, which I have just drawn up in this room, and we are going to witness it. I want you to witness it.' The colonel said something to them. The colonel said, 'Yes, it is my will,' or some short sentence, and I said, as I remember it, 'Mr. Miles, you declare this to be your last will and testament, and that you sign it here in the presence of these two gentlemen?' He said, 'I do,' and he signed it in an exceedingly shaky hand, and when he got through the signature, I could hardly recognize it, the Miles part was plainer than the Stephen part. I said, 'Gentlemen, I want you to witness this. Do you witness this in the presence of Mr. Miles, the testator, and in the presence of each other,' and they said, 'We do,' and signed under a clause so declaring. I then took my original draft and entered on it, as I recall, the names of the two witnesses to that will.'' He then testifies he did not know the men, and does not know or remember their names. He says he folded the will in the ordinary way, indorsed its contents, with his name at the bottom of the folded paper, put the original draft in his pocket and carried it out of the room; that it was complete including the signature. When asked if the will contained a revocatory clause his answer was: "The last clause of the will proper as executed, as I remember it, was this: 'I declare this will to be in revocation of all previous wills and testaments I have made, and further declare it is to be of my own free act and deed.' " He further testifies that, having seen a notice in a newspaper a day or two after the will was written that Mr. Miles was a "man of property, I took out that original draft from my desk, and dictated to Mrs. Wilson a copy, saying I thought it would be worth while to keep that will—it might come up some day; that evidently the old man was worth a good deal of money, and the newspapers said he was, and I thought I would fix it in such a condition that I could preserve it, and I dictated it to her, and she put it down on the typewriter in duplicate and gave me both copies, and I put one in my office desk, and took

the other one and the original draft out to my house, and either one of them, or both, went into my trunk." Both are said to have been finally lost. There is such a clear conflict in the testimony of plaintiffs' witnesses as to create the impression that, to say the least, the fact of the execution of the alleged St. Louis will, *by Stephen B. Miles*, is left in serious doubt. It may be that some one applied to Mr. Gadsden to write a will as asserted, but the description of that person, as given by Mrs. Wilson, does not coincide with the appearance or description of Stephen B. Miles, as given by plaintiffs' witnesses who knew him. Again, she testifies in the most positive way that before the will was taken to the hotel for execution it was dictated to her, taken in shorthand and written with a typewriter, and then taken in a "rush" to be signed. In this she contradicts the testimony of Gadsden, who says the will was written by an unknown person in the room occupied by Miles, the testator. Each is positive, and both cannot be correct. As we have seen, Gadsden testified in detail as to the execution of the will, giving just what he said to the witnesses and to Mr. Miles, which is herein above set out. The two alleged witnesses to the will were called by plaintiffs as witnesses upon the trial, and, if they are to be believed at all, Gadsden was not present on the occasion referred to by them. If Gadsden told the truth as to what he said and did, then there is no proof that the will was ever witnessed, for the two witnesses, and the only ones testifying to the witnessing of a will, did not witness the will he wrote.

Mr. Quynn, one of the two, testifies that he was called to witness a will; that it had been written with a pen, but that the only evidence he had that it was a will was a remark by Mr. Miles that the paper was his will; that he did not read a word of it, has never seen it since; that there must have been 8 or 10 sheets or leaves, forming a bulk or body of sheets of paper about half an inch in thickness; while Gadsden testifies there were but 2 sheets or leaves, making less than 4 pages. Quynn testifies fur-

ther that those present were Mr. Miles, Mr. Miller, the other witness to the paper, himself, and another man of from 35 to 37 years of age. The description he gives of the fourth man renders it quite certain it was not Gadsden. He states that said fourth man did not utter a word during the whole time they were present; that he never, to his knowledge, saw Gadsden, either before or since, and did not know the fourth man present. Mr. Miller, the other alleged witness to the will, testifies that when he went into Miles' room the fourth man was there. Then he, as he remembers, went down to the hotel office for Quynn, and when he returned the man who was there where he left him remained while the paper was being witnessed, but did not utter a word during the whole time, to the knowledge of the witness. He does not know if he knew the man, has no recollection upon that subject, is unable to give any description of him. It is very clear that by the absolute silence of that man he did not in any degree attract Miller's attention or notice, nor was he interested in the execution of the will.

Note what Gadsden testifies to: "When the second man came in I said, 'Gentlemen (addressing the witnesses), this is a will Mr. Miles is making, which I have just drawn up in this room, and we are going to witness it.' * * * The colonel said, 'Yes, it is my will,' or some short sentence, and I said, as I remember it, 'Mr. Miles, you declare this to be your last will and testament, and that you sign it here in the presence of these two gentlemen.' He said, 'I do.'" And again, he says he said to the witnesses: "'Gentlemen, I want you to witness this. Do you witness this in the presence of Mr. Miles, the testator, and in the presence of each other,' and they said, 'We do.'" It is very evident that nothing of this kind occurred on the occasion referred to by Mr. Miller and Mr. Quynn. There is collateral evidence, not depending upon the testimony of Gadsden, that he (Gadsden) probably wrote a will for some one about the date referred to, but this collateral evidence falls far short of proving that that one was

Stephen B. Miles. It may be possible that Gadsden was deceived, yet in view of some phases of his testimony it is difficult to harmonize what he says with the exact truth and a conscientious relation by him of the facts while upon the witness stand. To say the least, he has displayed a most remarkable memory of details of minor importance occurring so long before the date upon which his testimony was given. This applies with equal force to his alleged memory of the names of the beneficiaries under the alleged will. He could have had but few interviews with Mr. Miles prior to the time it is claimed Miles signed the will, and none after. They were total strangers until he says Miles came into his office two or three days before he says the will was made. They never met afterward. He seems to have paid no attention to the identity of the two young men, one of whom he says wrote the alleged will, nor to the men who it is claimed by him witnessed the execution of the will. Had he done so he could have remembered who they were, having met and associated with them, as he says, fully as well and distinctly as the names of those whom he never saw. It seems to the writer that he "doth protest too much." An uncharitable view, insisted upon by counsel for defendants, and not without some foundation, is that he had by some means been furnished with certain facts concerning Stephen B. Miles, his family and property, but not by counsel practicing at this bar and residing in this state. This subject need not be here discussed. He perhaps did discuss the question of the necessity for a revocatory clause in a will with Mr. Wind with whom he was officing. He probably exhibited to Mr. Cannon a folded paper said to be a copy of a will he had written, but of this we only have his evidence, as Mr. Cannon did not see the contents of the paper. These and other facts testified to by the witness named may have occurred, and yet the instrument, if written, not have been the will of Mr. Miles. The description of the little, old, debilitated man, given by Mrs. Wilson, does not correspond in any particular with the appearance and

condition of Mr. Miles, as testified to by Quynn and a number of other witnesses. Gadsden's story, upon his return to his office, of appearances at the room where he said he had been, and to which he testified, is not sustained by any witness who was present in Miles' room at the time they claim they witnessed the execution of a will by Miles. His office was not very far from the St. James hotel. He had a competent typist there. When he arrived at the room of the testator he found a total stranger present. He was informed that it was desired that the will be made that day. There was no paper at hand. The necessary material was sent for while he waited. He asked the strange gentleman to write the will as he dictated or read it from the paper which he held. It was written, read and compared with his "rough draft" and found to be an exact copy. Common experience teaches us that economy of time and the preservation of the secrets of his client would have caused him to return to his office and had the will typewritten. The story is far from convincing. So far as is shown by the evidence, that was the last that was ever seen of the alleged will. If Gadsden's story is true, that will was never witnessed by either Miller or Quynn. If their story is true, they witnessed a much more extended instrument when Gadsden was not present and of which he had no knowledge, and of the contents of which neither the witnesses, the district court, nor this court have been advised.

It is not our purpose to enter into an examination or discussion of the motives, actions or consciences of the witnesses, nor to make any unnecessary unfavorable comments upon them personally, as those whose testimony is now under consideration are citizens of another state, and whose lives are wholly unknown to the courts passing upon this case, except as the same may be reflected by the testimony of witnesses and the record. It is our opinion that both Mr. Miller and Mr. Quynn are mistaken when they testify, as they probably believe, that they witnessed a will for Stephen B. Miles. As we have above indicated,

they were permitted to know nothing whatever as to the contents of the paper which they say they witnessed. All they claim to *know* about it is that Mr. Miles said it was his will. So far as is shown by the proofs, neither they nor any other person now living has ever since seen such a document. It seems to us that, assuming the candor and truthfulness of those men, Mr. Quynn may easily have been deceived as to the papers he then signed, and that another transaction, when recalled nearly two years thereafter, may have misled his mind in remembering the facts. The date fixed by all the witnesses in support of the theory that a will was made is the very last days of March or first days of April, 1897, the stronger inclination being the last day of March. It is shown that on that day Mr. Quynn witnessed a number of instruments for Miles and Miller, to wit, a promissory note for $6,000 from Miller to Miles, the assignment of stock in the St. James Hotel Company from Miller to Miles, and four assignments of bank stock from Miles to Miller, copies of all of which are attached to the bill of exceptions showing the date to be March 31, 1897. Both Miller and Quynn develop a high degree of uncertainty as to just where that transaction occurred—whether in the office of the hotel, or in the room occupied by Mr. Miles. Accepting their testimony as an effort to be truthful, it is very clear that neither of them know. Since no will has been brought to light, we are forced to the conclusion that none was made, and that the witness Quynn is mistaken, or may have been deceived, as to what the instrument was or instruments were, which he signed. This might have been the case with Miller. He was present when the transfers were made, but his memory is sadly at fault as to just where it was done. There can be no doubt but at that time both Miller and the hotel company were on the verge, at least, of insolvency and bankruptcy. He at that time purchased $6,000 worth of solvent and good bank stock of Miles, giving his note therefor, secured by the assignment of the hotel stock as collateral. Miller was the principal, almost

the exclusive, owner of the capital stock of the hotel company. He had formerly had a lease upon the hotel, and owned the furniture and property therein. He organized the hotel company as a corporation, fixing the value of the assets at $40,000. He gave one share of the stock to a man by the name of Moore in order that he might be eligible as a member of the board of directors. He was indebted to Quynn, and transferred a small portion of the stock to him. He was also indebted to another, and settled the demand with a transfer of stock. He was the president of the company, and Quynn was the secretary and treasurer without bond. Some time after his purchase of the bank stock from Miles, the execution of his note and the assignment of the collateral, the hotel company made an assignment, and he went into bankruptcy, canceling his debts without any payment whatever, his note was worthless, the hotel stock was equally so, and the Miles' estate lost the whole of the $6,000. He may not have intended to practice a fraud and swindle upon Mr. Miles, his guest and friend, but we cannot escape the conviction that he knew of the rotten condition of the hotel company, the worthless character of its stock, and of his own insolvency. Under these circumstances it is hard to believe that he could not remember with clearness the details of the transaction of the execution of the note and the making of the assignments and where it occurred.

As we have said, the question of the making of a will in St. Louis is, and must be, the controlling one in this case. The burden of proof to establish the fact of the making of the will is upon plaintiffs. It is the well-settled doctrine in this state that "parol evidence to show that a former will was revoked by implication by reason of a subsequent will, which cannot be found, must be clear, unequivocal and convincing." *Williams v. Miles*, 68 Neb. 463; *Clark v. Turner*, 50 Neb. 290. In the latter case we quote with approval the following from *Chisholm's Heirs v. Ben*, 7 B. Mon. (Ky.) 408: "The books of reports contain many cases in which wills lost or de-

stroyed have been offered for probate upon parol or other secondary evidence of their contents, and many in which such wills were established. But in an examination of these cases, as extensively as opportunity would allow, we have found none in which there does not seem to have been the evidence of witnesses who knew, or might be presumed to have known, the contents of the will from their own inspection; none in which the declarations or even professed reading of the decedent have been held to be alone sufficient on this point; and none which would sanction their admission upon the question of the contents of the will with any other effect than as merely corroborative of the more direct evidence." As we have seen, the witnesses to the paper, said and alleged to be the will of Mr. Miles, knew nothing whatever as to its contents and have never seen it since. If we eliminate the testimony of Gadsden as to the contents of the will which he says he wrote, but which was not witnessed in his presence by either Miller or Quynn, there is not a scintilla of evidence as to the contents of the paper, the existence of which is sought to be established as the will of Mr. Miles. This, to our minds, must be decisive of the case.

It is said the provisions of the Rulo will are unjust and an improper discrimination in favor of some of the children of the deceased and against others. As viewed from the standpoint of conditions as they exist at this time, and not at the time of the making of the will, or up to the time of the death of the testator, this would seem true. But, unfortunate as it may be for some who are not so well provided for and who are now respected, respectable and moral citizens, we are not prepared to denounce the testator as having been during his life lacking in judgment or a disposition to conserve his estate and do justice between his children. It would, no doubt, have been intensely gratifying to Mr. Miles could he have said at any time before his death that the best and proper thing to do would be to divide his large estate equally among his children, giving to each his full share in fee absolute,

but who can say that would have been the best or even the proper thing to do. It sometimes occurs that not only would an estate, the labors of a lifetime, be squandered, but that the recipient of wealth suddenly bestowed would be, in reality, injured thereby. This is by law left to the conscience and judgment of the testator.

Evidence was taken and submitted bearing upon the conduct and statements of Mr. Miles after his return from St. Louis and before his death. If we apply the rule of *Clark v. Turner, supra,* the statements of the testator, if made, that he had made a will in St. Louis, or elsewhere, subsequent to the execution of the Rulo will, could not establish either the fact of the execution or contents of such will. If he disposed of and distributed to his heirs property claimed by plaintiffs to have been devised and bequeathed by the supposed will, but not in accordance with its supposed provisions, if entitled to any consideration, it could only be construed as indicating that no will had been made.

It was sought to prove by the facts and testimony of witnesses that defendant Joseph H. Miles was guilty of unfilial conduct toward his father at the time of his last sickness and death, and thereafter in connection with the remains of the deceased, and that he did not act in good faith with his brother Samuel, as well as the contention that he had had the opportunity to find and destroy the will said to have been made at St. Louis, but we find no satisfactory proof of unfilial conduct upon his part, and there is no evidence that he ever found or destroyed any will. These charges rest in suspicion which it is hoped is entertained only by counsel.

Not only do we find no sufficient reason for disturbing the decree of the district court, but we are satisfied that the finding and decision of that court that "Stephen B. Miles did not execute a will in St. Louis in 1897, as alleged in plaintiffs' petition, and that the will known in the records as the 'Rulo will' is the last will and testament

34

of Stephen B. Miles, deceased," is right, and the decree dismissing this action should be, and is,

AFFIRMED.